## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FOREST HILLS SCHOOL DISTRICT,** | : | |
| | : | **CASE NO.** _3:22cv182_ |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| | : | |
| **JUUL LABS, INC.; ALTRIA GROUP, INC.,** | : | |
| **ALTRIA CLIENT SERVICES; ALTRIA** | : | |
| **GROUP DISTRIBUTION COMPANY;** | : | |
| **PHILIP MORRIS USA, INC.; JAMES** | : | |
| **MONSEES; ADAM BOWEN; NICHOLAS** | : | |
| **PRITZKER; HOYOUNG HUH; RIAZ** | : | |
| **VALANI and JOHN DOES 1-100,** | : | |
| **INCLUSIVE,** | : | |
| | : | |
| **Defendants.** | : | |

## COMPLAINT

## I. INTRODUCTION

1.      Plaintiff, Forest Hills School District,  brings this Complaint against Defendants JUUL Labs, Inc. ("JUUL"); Altria Group, Inc.; Altria Client Services; Altria Group Distribution Company (collectively "Altria Defendants"); Philip Morris USA, Inc.; James Monsees; Adam Bowen; Nicholas Pritzker; Hoyoung Huh; Riaz Valani (collectively "Management Defendants") and, John Does 1-100 seeking injunctive relief, abatement and damages arising out of the damages incurred as a result of Defendants' wrongful conduct as more fully set forth herein.

2.      Defendants' marketing strategy, advertising, and product design targets minors, especially school age minors, and has dramatically increased the use of e-cigarettes amongst the student body of the Forest Hills School District. Defendants' conduct has caused many students to become addicted to Defendants' e-cigarette products.

3.      Plaintiff, and similarly situated school districts in the Commonwealth of

Pennsylvania, have redirected significant resources to combat Defendants' deceptive marketing scheme, to educate its students on the true dangers of Defendants' e-cigarette products and to prevent the possession and use of Defendants' e-cigarette products on Plaintiffs' property.

## I.   JURISDICTION AND VENUE

4.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's racketeering claim arises under the laws of the United States, 18 U.S.C. § 1961 *et seq.*, and pursuant to 28 U.S.C. § 1332(a) because: (i) the amount in controversy exceeds $75,000, exclusive of interests and cost, and (ii) the plaintiff and defendants are citizens of different states.

5.   The Court has personal jurisdiction over Defendants because they do business within the jurisdiction of the United States District Court for the Western District of Pennsylvania and have sufficient minimum contacts with the Western District. Defendants have sufficiently availed themselves to the markets of the Commonwealth of Pennsylvania through their promotion, marketing, and sale of the e-cigarette products at issue in this lawsuit to render this Court's exercise of jurisdiction under Pennsylvania law and the United States Constitution.

6.   Forest Hills School District is located in the Western District of Pennsylvania.

## II.   PARTIES

7.   Plaintiff, Forest Hills School District, ("hereinafter referred to as "School District") is a public school district organized and existing in accordance with the laws of the Commonwealth of Pennsylvania with its geographic boundaries located in the County of Cambria, Commonwealth of Pennsylvania which is located within the United States District Court for the Western District of Pennsylvania. The School District educates approximately 1,789 Kindergarten through 12th-grade students. The School District is composed of Forest Hills Elementary School and Forest Hills

Junior-Senior High School. The School District administrative offices are located at 549 Locust Street, Sidman, PA 15955.

8.      The School District is operated in accordance with the Pennsylvania Public School Code, as amended, *24 P.S. §1-101, et seq.*, which provides for a nine (9) member Board of School Directors with the statutory authority to act on behalf of the School District.  The current President of the Board is Mr. Galen George, and the current Superintendent of Schools is Dr. David Lehman.

9.      Defendant JUUL is a Delaware corporation, having its principal place of business in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc. JUUL manufactures, designs, sells, markets, promotes and distributes JUUL e-cigarettes, JUULpods and accessories throughout the Commonwealth of Pennsylvania and the nation.

10.     Defendant Altria Group, Inc. is a Virginia corporation, having its principal place of business in Richmond, Virginia. Altria is one of the world's largest producers and marketers of tobacco products. On December 20, 2018, Altria purchased a 35% stake in JUUL.

11.     Defendant Altria Client Services Inc. is a New York corporation and wholly- owned subsidiary of Altria Group, Inc. with its principal place of business in Henrico County, Virginia. Altria Client Services Inc. provides Altria Group, Inc. and its companies with services in many areas including digital marketing, packaging design & innovation, product development, and safety, health, and environmental affairs. On September 25, 2019, the former senior vice president and chief growth officer of Altria Client Services Inc., K.C. Crosthwaite, became the new chief executive of JUUL.

12.     Defendant Altria Group Distribution Company is a Virginia corporation and wholly-owned subsidiary of Altria Group, Inc. with its principal place of business in Henrico

County, Virginia. Altria Group Distribution Company provides sales, distribution and consumer engagement services to Altria's tobacco companies.

13.     Defendant, Philip Morris USA, Inc. (Philip Morris), is a wholly-owned subsidiary of Altria. Philip Morris is also a Virginia corporation that has its principal place of business in Richmond, Virginia. Philip Morris is engaged in the manufacture and sale of cigarettes in the United States. Philip Morris is the largest cigarette company in the United States. Marlboro, the principal cigarette brand of Philip Morris, has been the largest selling cigarette brand in the United States for over 40 years.

14.     Plaintiff presently lacks information sufficient to specifically identify the true names or capacities, whether individual, corporate, or otherwise, of the Defendants sued herein under the fictitious names DOES 1 through 100 inclusive. Plaintiff will amend this Complaint to show their true names and capacities if and when they are ascertained. The Plaintiff is informed and believes, and on such information and belief alleges, that each of the Defendants named as a DOE is responsible in some manner for the events and occurrences alleged in this Complaint and is liable for the relief sought herein.

**Management Defendants**

15.     Defendant James Monsees is a resident of the San Francisco Bay area, California. In 2007, he co-founded Ploom with Adam Bowen. He served as Chief Executive Officer of JLI until October 2015. Since October 2015, he has been Chief Product Officer of JLI. At all relevant times, he has been a member of the Board of Directors of JLI until he stepped down in March 2020.

16.     Defendant Adam Bowen is a resident of the San Francisco Bay area, California. In 2007, he co-founded Ploom with Defendant Monsees. At all relevant times, he has been Chief Technology Officer and a member of the Board of Directors of JLI.

17.     Defendant Nicholas Pritzker is a resident of San Francisco, California, and a member of the Pritzker family, which owned the chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. Pritzker received a J.D. from the University of Chicago. He served as president of the Hyatt Hotels Corporation and was a member of its Board of Directors from 1980 to 2007. More recently, he co-founded Tao Capital, an early investor in, among other companies, Tesla Motors and Uber. In 2011, he invested in JLI.[1] He has been on the Board of Directors of JLI since at least August 2013.[2] At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors and served as Co-Chairman. He controlled two of JLI's seven maximum Board seats (the second of which was occupied at relevant times by Alexander Asseily and Zachary Frankel).[3]

---

[1] Ainsley Harris, *How JUUL went from a Stanford thesis to $16 billion startup*, Fast Co. (Mar. 8, 2020), https://www.fastcompany.com/90263212/how-JUUL-went-from-a-stanford-thesis-to-16-billion-startup.
[2] JLI01426164.
[3] JLI01356230; JLI01356237; JLI00417815 (same in February 2018); JLI01362388; JLI01439393; JLI01440776.

18.     Defendant Hoyoung Huh currently lives in Florida. During most of the relevant time period, he lived and worked in the Silicon Valley area, California. He holds an M.D. from Cornell and a Ph.D. in Genetics/Cell Biology from Cornell/Sloan-Kettering. He has been CEO or a Board member of numerous biotechnology businesses, including Geron Corporation. Huh has been on the Board of Directors of JLI since at least June 2015. At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors. Huh occupied the Board seat appointed by a majority of the JLI Board.[4]  Huh resigned from JLI's board in May 2018.[5]

19.     Defendant Riaz Valani lives near San Jose, California and is a general partner at Global Asset Capital, a San Francisco-based private equity investment firm. He first invested in JLI in 2007, and has been on the Board of Directors of JLI since at least 2007.[6] At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors. HeHe controlled two JLI's maximum seven Board seats.[7] Beginning around March 2015, Valani's second seat was occupied by Hank Handelsman; Zach Frankel may have occupied Valani's second seat starting in 2017, though Handelsman remained on the board.[8]

20.     Defendants Monsees, Bowen, Pritzker, Huh, and Valani are referred to collectively as the "Management Defendants."

21.     The Altria Defendants, Monsees, Bowen, Pritzker, Huh, and Valani are referred to collectively as the "RICO Defendants."

### III.     ALLEGATIONS OF FACT

---

[4] *Id*.
[5] JLI01425022.
[6] JLI01437838; Ploom, Inc., Notice of Exempt Offering of Securities (Form D) (May 5, 2011), https://www.sec.gov/Archives/edgar/data/1520049/000152004911000001/xslFormDX01/primary_doc.xml.
[7] JLI01426710; JLI01365707; INREJUUL_00327603; JLI00417815.
[8] JLI01356230; JLI01356237; JLI00417815; JLI01365706; JLI01362388; JLI01439393; JLI01440776.

**A.      The Youth Vaping Epidemic and the Rise of JUUL**

22.      One of the great public health success stories over the past decade has been a reduction in youth tobacco use and in nicotine addiction. Youth smoking rates plummeted from 28% in 2000 to 7.6% in 2017.[9] This success has been the result of years of litigation and strict regulation. It is also due to the widespread and mainstream public health message that smoking kills people – a message that Big Tobacco can no longer dispute or contradict.

23.      This incredible progress towards eliminating youth tobacco and nicotine use has now largely been reversed due to e-cigarettes and vaping. Between 2011 and 2015, e-cigarette use among high school and middle school students increased 900%.[10] Between 2017 and 2018, e-cigarette use increased 78% among high school students, from 11.7% of high school students in 2017 to 20.8% of high schoolers in 2018.[11] Among middle school students, e-cigarette use increased 48% between 2017 and 2018.[12] In 2018, 4.9 million middle and high school students used tobacco products, with 3.6 million of those students using e-cigarettes.[13] Between 2017 and 2018, the number of youth e-cigarette users increased by 1.5 million.[14]

24.      According to the Centers for Disease Control and Prevention ("CDC") Director Robert Redfield, "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made in reducing tobacco use. It's putting a new generation at risk for

---

[9] Meredith Berkman, Testimony of Meredith Berkman, Parents Against Vaping E-cigarettes, U.S. House Committee on Oversight & Reform (July 24, 2019),
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Berkman-PAVe%20Testimony.pdf.
[10] Jerome Adams, Surgeon General's Advisory on E-cigarette Use Among Youth, Ctrs. for Disease Control & Prevention (Dec. 2018), https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.
[11] Id.
[12] 2018 NYTS Data: A startling rise in youth e-cigarette use, U.S. Food & Drug Admin. (Feb. 2, 2019), https://www.fda.gov/tobacco-products/youth-and-tobacco/2018-nyts-data-startling-rise-youth-e-cigarette-use.
[13] Id.
[14] Id.

nicotine addiction."[15] The U.S. Food and Drug Administration ("FDA") Commissioner Scott Gottlieb described the above statistics as "astonishing" and both the FDA and the U.S. Surgeon General have appropriately characterized youth vaping as an "epidemic."[16] The National Institute on Drug Abuse found that the 2018 spike in nicotine vaping was the largest for any substance recorded in 44 years, and Alex Azar, Secretary of the U.S. Department of Health and Human Services declared that "[w]e have never seen use of any substance by America's young people rise as rapidly as e-cigarette use [is rising]."[17]

25.     A major cause of this epidemic is JUUL Labs, Inc., the maker of the JUUL e-cigarette. JUUL entered the e-cigarette market in 2015 and now controls over 70% of it.[18] Over a million JUUL e-cigarettes were sold between 2015 and 2017.[19] JUULs are available at over 12,000 retail stores and online.[20] In 2017, JUUL generated over $224 million in retail sales, a 621% year-over-year increase.  By June 2018, sales had skyrocketed another 783%, reaching $942.6 million. The e-cigarette category as a whole grew 97% to $1.96 billion in the same period, largely based on JUUL's market success.[21] JUUL's dominance of the e-cigarette market has been so rapid,

---

[15] Texas governor signs law increasing the age to buy tobacco products to 21, CNN (June 8, 2019), https://m.cnn.com/en/article/h_b4cf0b92fd821251a4ae48df9b717145.

[16] Angelica LaVito, FDA chief Gottlieb threatens to pull e-cigarettes off market if 'astonishing' surge in teen use doesn't slow, CNBC (Nov. 16, 2018), https://e-cigarettes-off-market.html; Jayne O'Donnell, FDA declares youth vaping an epidemic, announces investigation, new enforcement, USA Today (Sept. 12, 2018), https://www.usatoday.com/story/news/politics/2018/09/12/fda-          scott-gottlieb-youth-vaping-e-cigarettes-epidemic-enforcement/1266923002/

[17] Jan Hoffman, Study Shows Big Rise in Teen Vaping This Year, N.Y. Times (Dec. 17, 2018), https://www.nytimes.com/2018/12/17/health/ecigarettes-teens-nicotine-.html; Rajiv Bahl, Teen Use of Flavored Tobacco was Down, But E-Cigarettes Are Bringing It Back Up, Healthline (Jan. 9, 2019), https://www.healthline.com/health-news/flavored-tobacco-use-rising-again-among-teens#An-unhealthy-habit.

[18] Richard Craver, Juul ends 2018 with 76 percent market share, Winston-Salem J. (Jan. 8, 2019), https://www.journalnow.com/business/juul-ends-with-percent-market-share/article_6f50f427-19ec-50be-8b0c-d3df18d08759.html

[19] Melia Robinson, How a startup behind the 'iPhone of vaporizers' reinvented the e-cigarette and generated $224 million in sales in a year, Bus. Insider (Nov. 21, 2017), https://www.businessinsider.com/juul-e-cigarette-one-million-units-sold-2017-11/.

[20] Id.

[21] Angelica LaVito, Popular e-cigarette Juul's sales have surged almost 800 percent over the past year, CNBC Health & Sci. (Sept. 11, 2018), https://www.cnbc.com/2018/07/02/juul-e-cigarette-sales-have-surged-over-the-past-year.html.

and so complete, that the act of vaping is now referred to as "JUULing."

26.     Juul's market dominance has attracted the attention and alarm of government regulators, including the FDA, the U.S. Surgeon General, and the CDC. On February 24, 2018, the FDA sent a letter to JUUL expressing concern about the popularity of its products among youth and demanding that JUUL produce documents regarding its marketing practices.[22] On September 12, 2018, the FDA sent letters to JUUL and other e-cigarette manufacturers putting them on notice that their products were being used by youth at disturbing rates.[23] In October 2018, the FDA raided JUUL's headquarters and seized more than a thousand documents relating to the Company's sales and marketing practices.[24] As of October 2019, the FDA, the Federal Trade Commission, multiple state attorney generals and the U.S. House of Representatives Committee on Oversight and Reform have all commenced investigations into JUUL's role in the youth vaping epidemic and whether JUUL's marketing practices purposefully targeted youth.

27.     The decline of cigarette use and the rise of JUUL is far from a coincidence. The Company was founded by Adam Bowen and James Monsees, both product designers by education and experience. Bowen and Monsees met in Stanford University's famed graduate product design program, where the first iteration of JUUL was their final project.[25] Monsees has described the cigarette as "the most successful consumer product of all time . . . an amazing product."[26]

---

[22] Matthew Holman, Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc., U.S. Food & Drug Admin. (Apr. 14, 2018), https://www.fda.gov/media/112339/download.
[23] Letter From US FDA to Kevin Burns, U.S. Food & Drug Admin. (Sept. 12, 2018), https://www.fda.gov/media/119669/download.
[24] Laurie McGinley, FDA seizes Juul e-cigarette documents in surprise inspection of headquarters, Wash. Post (Oct. 2, 2018), https://www.washingtonpost.com/health/2018/10/02/fda-seizes-juul-e-cigarette-documents-surprise-inspection-headquarters
[25] Julia Belluz, The Vape Company Juul Said It Doesn't Target Teens. Its Early Ads Tell a Different Story, Vox (Jan. 25, 2019), https://www.vox.com/2019/1/25/18194953/vape-juul-e-cigarette-marketing.
[26] Gabriel Montoya, Pax Labs: Origins with James Monsees, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/ (last visited Sept. 7, 2019). 21 Onboardly Interview with Ploom Cofounder and CEO James Monsees, Pax.com (Apr. 30, 2014), https://www.pax.com/blogs/press/onboardly.

28.     Years of litigation, regulation, and education by public health advocates, the medical community, and elected officials against Big Tobacco had severely tarnished the popularity of cigarettes. Monsees and Bowen thus set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."[27] Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."[28] Seeking to recreate the lost "ritual and elegance that smoking once exemplified," Monsees set out to re-design the cigarette "to meet the needs of people who want to enjoy tobacco but don't self-identify with—or don't necessarily want to be associated with— cigarettes."[29] In essence, the objective of JUUL was to build a newer, more attractive cigarette. One that could addict a new generation of smokers. By design, a cornerstone of the product's commercial success is its addictive nature.

29.     JUUL is, in many ways, the paradigmatic start-up. It has all the markings of Silicon Valley success: staggering profit margins, meteoric growth, and status as a cultural phenomenon. The Silicon Valley-savvy company used the framework and ideology of startup culture to catapult itself to success by every metric in the startup industry. In 2018, JUUL's gross profit margins were 70% and it represented 76.1% of the national e-cigarette market.[30] It shattered previous records for reaching decacorn status, reaching valuation of over $10 billion in a matter of months, or four times faster than Facebook.[31]   This all came just three years after its product launch.

---

[27] Onboardly Interview with Ploom Cofounder and CEO James Monsees, Pax.com (Apr. 30, 2014), https://www.pax.com/blogs/press/onboardly.
[28] Id.
[29] Id.
[30] Robert K. Jackler et al., JUUL Advertising Over Its First Three Years on the Market 2, Stanford Res. into the Impact of Tobacco Advert. (2019) ("Juul Advertising"),
http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
[31] Zack Guzman, Juul Surpasses Facebook As Fastest Startup to Reach Decacorn Status, Yahoo! Fin. (Oct. 9, 2019), https://finance.yahoo.com/news/juul-surpasses-facebook-fastest-startup-reach-decacorn-status- 153728892.html.

30.     JUUL's staggering commercial success didn't come from a blank slate. Under the Master Settlement Agreement between Big Tobacco and the States, the public has access to hundreds of thousands of Big Tobacco's internal documents. In creating JUUL, Monsees and Bowen carefully studied the marketing strategies, advertisements, and product design of Big Tobacco. As Monsees candidly acknowledged, the internal tobacco documents "became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch-up, right, to a huge, huge industry in no time. And then we started building prototypes."[27]

31.     Some of the Big Tobacco records that Monsees and Bowen reviewed showed documents on how to manipulate nicotine pH to maximize nicotine delivery in a vapor while minimizing the "throat hit" that may potentially deter new smokers. Other records relate to tobacco industry market strategies and advertisements designed to lure non-smoking youth. Monsees and Bowen were able to take advantage of an extensive online tobacco advertising research database maintained by the Stanford Research into the Impact of Tobacco Advertising ("SRITA"), an inter-disciplinary research group devoted to researching the promotional activities of the tobacco industry. SRITA's database contains approximately 50,000 original tobacco advertisements. According to Monsees, JUUL's advertising was informed by traditional tobacco advertisements, and SRITA, in particular, had been very useful to JUUL.[32]

32.     Put simply, the marketing and product design of the JUUL e-cigarette, and its incredible commercial success, are based upon tactics and strategies developed by Big Tobacco. As set forth below, while Big Tobacco was prohibited from employing these tactics and strategies to market traditional cigarettes by virtue of the Master Settlement Agreement and subsequent

---

[32] Jackler, Juul Advertising at p. 27.

regulations, nothing prevented JUUL from doing so.

**B.     Big Tobacco and E-Cigarettes**

33.     While JUUL revolutionized and dominated the e-cigarette market, it did not create the first one. Prior to JUUL, Big Tobacco—including Altria—was also heavily involved in the manufacture and promotion of e-cigarettes. Altria has been one of the biggest losers in the fight against smoking. Altria estimates that the cigarette industry declined by -4% in 2017 and by - 4.5% in 2018. For 2019 through 2023, Altria estimated for the average annual U.S. cigarette industry volume declines is -4% to -5%.[33] Altria later revised this estimate in the second quarter of 2019 from 4-5% to 4-6%, in light of efforts to increase the legal age for cigarette smoking to 21.[34]

34.     In the face of these numbers, Altria turned to e-cigarettes, along with other "non-combustible products," to "enhance" its business platform.[35] Altria boasted to shareholders that it "aspire[d] to be the U.S. leader in authorized, non-combustible, reduced-risk products."

35.     Altria entered the e-cigarette market with a cigarette-lookalike, or "cigalike," style of e-cigarette, sold under the brand MarkTen. Following a phased roll-out of MarkTen in Indiana and Arizona in late 2013, Altria launched the MarkTen nationwide in 2014 with an aggressive marketing campaign, eclipsing the advertising expenditures for Imperial Tobacco's e-vapor product, blu.[36]

36.     E-cigarette advertising spending for 2014 totaled $88.1 million, a 52% increase from 2013.[34] Of that $88.1 million spent in 2014, nearly 40% of that was Altria's MarkTen

---

[33] Presentation for Altria's Fourth-Quarter 2018 Earnings Conference Call, Altria (Jan. 31, 2019), http://investor.altria.com/Cache/1001247877.PDF?O=PDF&T=&Y=&D=&FID=1001247877&iid=4087349.
[34] Altria Shares Slide As Cigarette Sales Continue to Decline, Tobacco Business (July 31, 2019), https://tobaccobusiness.com/altria-shares-slide-as-cigarette-sales-continue-to-decline/.
[35] Presentation for Altria's Second-Quarter 2019 Earning Conference Call, Altria (July 30, 2019),
[36] Cantrell, Jennifer & Emelle, Brittany & Ganz, Ollie & Hair, Elizabeth & Vallone, Donna. (2015). Rapid increase in e-cigarette advertising spending as Altria's MarkTen enters the marketplace. Tobacco Control. 25. 10.1136/tobaccocontrol-2015-052532

campaign, at $35 million.[35]

37.     Altria's MarkTen advertising tag line, "Let It Glow," was criticized by public health advocates for playing off Disney's popular children's movie "Frozen" and its hit song "Let it Go."[36]

38.     Even the then-president of R.J. Reynolds Vapor Company, Stephanie Cordisco, criticized Altria for irresponsible marketing, calling this tag line "terrible" and saying that the companies "running the most irresponsible campaigns are the ones who know better."[37] At the time, the president of the Campaign for Tobacco-Free Kids said that companies like Altria were using "exactly the same themes we saw work with kids in the U.S. for decades with cigarettes."[38]

39.     Although free samples of tobacco products are prohibited under the terms of the Tobacco MSA as well as FDA regulations issued in 2010, Altria took advantage of the grey area in the regulation of e-cigarettes and distributed coupons for free sample nicotine cartridges as part of its MarkTen launch. (The FDA has since issued finalized guidance clarifying the scope of the ban on distributing free samples or coupons for e-cigarettes or components.)

40.     Altria also took full advantage of its distribution network, reaching 60,000 stores in a month.[39] In Arizona, for example, Altria's distribution network allowed MarkTen to achieve a 48% e-cigarette market share in just seven weeks after launch, according to then-CEO Marty Barrington's statements on an earnings call.[40] Altria was clear in its intent to dominate the e-cigarette market as it has the traditional cigarette one: "We are the market leader today and we will continue to be," Barrington told investors.[41]

---

[37] Matt Richtel, A Bolder Effort by Big Tobacco on E-Cigarettes, NY TIMES (June 17, 2014), https://www.nytimes.com/2014/06/17/business/a-bolder-effort-by-big-tobacco-on-e-cigarettes.html.
[38] Id.
[39] Mike Esterl, Altria To Launch MarkTen E-Cigarette Nationally, Wall Street Journal (Feb. 19, 2014), https://www.wsj.com/articles/altria-to-launch-markten-e-cigarette-nationally-1392832378.
[40] Id.
[41] Id.

41.     Altria began acquiring small companies in the vaping industry, starting in 2014 with Green Smoke, Inc., whose e-cigarettes were also the "cigalike" style.[42] In 2017, Altria acquired a vape product called Cync, from Vape Forward. Cync is a small vapor device that uses pre-filled pods, similar to JUUL. It also made a minority investment in Avail Vapor, one of the largest vape store chains in the U.S., which also produces and sells its own branded e-liquids for so-called open-system devices, which are refillable.[43]

42.     In February 2018, Altria announced that it would enter the closed-tank market with the MarkTen Elite: "a pod-based product with a premium, sleek battery design" and having the "convenience of prefilled, magnetic click pods." At an analyst conference in February 2018, former Altria chief Marty Barrington boasted that the Elite's pods held more than twice as much liquid as JUUL's.[44]

43.     Altria quickly followed with another pod-based product, the Apex, byMarkTen.

44.     Because e-cigarettes are subject to more relaxed regulation than cigarettes, Altria was able to market its products in ways it could not have done for traditional tobacco products. Altria marketed its e-cigarettes in flavors that would appeal to youth: Strawberry Brulee, Apple Cider, Hazelnut Cream, Spiced Fruit, Piña Colada, Glacier Mint, and Mardi Gras (apparently a mixed berry flavor). Most of these flavors were marketed with the Elite and Apex products, Altria's "pod" e-cigarettes.

45.     Altria's push to gain the youth market gained the attention of the FDA. On September 12, 2018, the FDA sent a warning letter to Altria, requesting that Altria respond with a

---

[42] Mike Esterl, Altria To Launch MarkTen E-Cigarette Nationally, Wall Street Journal (Feb. 19, 2014), https://www.wsj.com/articles/altria-to-launch-markten-e-cigarette-nationally-1392832378.
[43] Timothy S. Donahue, At the Forefront, Tobacco Reporter (Dec. 1, 2017), https://www.tobaccoreporter.com/2017/12/at-the-forefront/.
[44] Marty Barrington, Remarks by Marty Barrington, Altria Group, Inc.'s (Altria) Chairman, Chief Executive Officer (CEO) and President, and other members of Altria's senior management team, US SEC (Feb.21, 2018), https://www.sec.gov/Archives/edgar/data/764180/000076418018000020/exhibit992-2018cagnyremarks.htm.

"detailed plan" to address and mitigate the widespread use of its e-cigarette products by minors.[45] Due to the "epidemic rate of increase in youth use" of e-cigarettes, the FDA had recently conducted an "enforcement blitz" of retailers nationwide and confirmed that Altria's MarkTen products were being sold to minors. The FDA did not mince words, telling Altria that "[t]his is unacceptable, both legally and as a matter of public health." The FDA warned Altria that it has a responsibility to ensure minors are not getting access to its products and that it was "crucial" that manufacturers like Altria take steps to prevent youth from using its products. First and foremost, the FDA asked Altria to "take prompt action to address the rate of youth use of MarkTen products." The FDA suggested that Altria could revise its current marketing practices, eliminate online sales, and remove flavored products from the market. The FDA's expectation and motivation was clear: "steps must be taken to protect the nation's young people."

46.     On October 25, 2018, Altria responded to the FDA, claiming to have "serious concerns" about youth access to e-vapor products.[46] It admitted that the use of e-cigarettes by youth had risen to "epidemic levels." In response, Altria agreed to remove its pod-based e- cigarettes from the market and stop selling any flavored traditional e-cigarettes other than tobacco, menthol, and mint. It acknowledged that "[b]ased on publicly-available information from FDA and others, we believe pod-based products significantly contribute to the rise in youth use of e-vapor products. We don't believe our products are the issue, but we don't want to risk contributing to the problem." Altria's letter went on to disclaim a numerous of practices that it associated with marketing to youth strategies that were key components of JUUL's marketing strategy. Altria specifically identified the use of flavors that go beyond traditional tobacco flavors, digitally advertising on

---

[45] Scott Gottlieb, Letter to Altria Client Services, U.S. Food and Drug Admin. (Sep. 12, 2018), https://www.fda.gov/media/119666/download.
[46] Howard A. Willard, Letter to Scott Gottlieb, Commissioner, Altria (Oct. 25, 2018), http://www.altria.com/About-Altria/Federal-Regulation-of-Tobacco/Regulatory-Filing/FDAFilings/Altria-Response-to-FDA-E-vapor-October-25-2018.pdf.

websites with a large percentage of youth visitors, using social media to promote the brand, allowing online purchases and promotional sign-ups without age verification, advertising e-cigarettes on billboards, advertising with models who appear to be under 25 years old, distributing branded merchandise, and paying celebrities or other third parties to market or use a particular brand's e-cigarette. Altria also claimed to support "banning vaping in schools" in order to reduce "social access." Altria ended the letter by committing to "reverse the current use trend among youth."

47.     Less than two months later, Altria changed its tune. On December 20, 2018, Altria announced that it would be making a $12.8 billion dollar investment in JUUL, the biggest equity investment in United States history.[47] The deal gave Altria a 35% stake in JUUL.

## C.     JUUL and Altria Join Forces to Protect JUUL's Market Share

48.     By the fall of 2018, JUUL was under intense scrutiny. A group of eleven United States senators wrote JUUL's CEO, Kevin Burns, a letter in April 2018, declaring that the JUUL device and JUULpods "are undermining our nation's efforts to reduce tobacco use among youth and putting an entire new generation of children at risk of nicotine addiction and other health consequences."[48] Less than a week later, then FDA Commissioner Gottlieb announced a crackdown on retailers to limit youth access to e-cigarettes and enforcement actions against JUUL in particular.[49] At the same time, the FDA sent JUUL a request for documents relating to

---

[47] Cromwell Schubarth, Vaping Unicorn Juul Opens Lab in Mountain View Amid Furor in S.F., Silicon Valley Bus. J. (Feb. 5, 2019), https://www.bizjournals.com/sanjose/news/2019/02/05/juul-opens-lab-in-mountain-view.html.

[48] Richard Durbin et al., Letter from 11 U.S. Senators, to Kevin Burns, CEO of JUUL Labs, Inc., United States Senate (April 18, 2018), https://www.durbin.senate.gov/imo/media/doc/JUUL%20Letter%20-%20S%20IGNED.pdf.

[49] Scott Gottlieb, Statement from FDA Commissioner Scott Gottlieb, M.D., on new enforcement actions and a Youth Tobacco Prevention Plan to stop youth use of, and access to, JUUL and other e-cigarettes (April 23, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-enforcement-actions-and-youth-tobacco-prevention?utm_campaign=04242018_Statement_Youth%20Tobacco%20Prevention&utm_medium=email&utm_source=Eloqua.

marketing, product design, and public health impact.[50]   In July 2018, Massachusetts Attorney

General Maura Healey announced an investigation into JUUL regarding marketing and sale to

minors.[51] In September 2018, FDA Commissioner Gottlieb called youth vaping an "epidemic" and

sent letters to JUUL, Altria, and other e-cigarette manufacturers demanding a plan to reduce youth

use.[52] Then, in October 2018, as alleged above, the FDA raided JUUL's headquarters and seized

more than a thousand documents relating to JUUL's sales and marketing practices.[53]

49.     On November 13, 2018, JUUL responded with an "Action Plan," declaring its

intent to stop selling certain flavors in brick-and-mortar stores, restrict purchases of those flavors

on the JUUL website to adults age 21 and over, and shut down its social media accounts.[54]

50.     As the pressure on JUUL intensified, Altria stepped in to assist. Despite the clear

criticism of JUUL's conduct in its October 25th letter to the FDA, Altria announced its $12.8

billion investment in JUUL on December 20, 2018.[55] Altria characterized its investment as one

intended to "accelerate harm reduction and drive growth."[56] In an investor presentation in 2019,

Altria described JUUL as having a "unique and compelling product."[57]

51.     But as the president of the Campaign for Tobacco-Free Kids observed upon

announcement of the deal, "Altria has no interest in seriously reducing the number of people who

smoke cigarettes."[58]

52.     Altria would not have made such an investment if it did not intend to grow JUUL's

---

[50] Id.
[51] Press Release, Office of Attorney General Maura Healey, AG Healey Announces Investigation into JUUL, Other Online E-Cigarette Retailers Over Marketing and Sale to Minors (July 24, 2018), https://www.mass.gov/news/ag-healey-announces-investigation-into-juul-other-online-e-cigarette-retailers-over-marketing.
[52] See https://www.fda.gov/tobacco-products/rules-regulations-and-guidance/ctp-letters-industry#youth-access
[53] See Letter From US FDA to Kevin Burns, supra note 19.
[54] https://newsroom.juul.com/juul-labs-action-plan/
[55] https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-
[56] Id.
[57] Altria Group, Inc. 2019 CAGNY Investor Presentation Available at
http://investor.altria.com/Cache/1500117496.PDF?O=PDF&T=&Y=&D=&FID=1500117496&iid=4087349
[58] https://www.nytimes.com/2018/12/20/health/juul-reaches-deal-with-tobacco-giant-altria.html

already enormous market even more. In fact, Altria said as much when announcing its investment, explaining that its investment in JUUL "enhances future growth prospects" and committing to applying "its logistics and distribution experience to help JUUL expand its reach and efficiency."[59] Since the deal was inked in December 2018, Altria's actions have clearly helped JUUL maintain, if not expand, its market share—a market share that, based on Altria's own October 25, 2018 letter to the FDA, it believes was gained by employing marketing and advertising practices that contributed to youth vaping. Altria's Second Quarter 2019 Earnings Call reported that JUUL continued to grow in the first half of 2019, from a 33% category share in 2018 to 48% by the second quarter 2019. JUUL's expected revenue for 2019 is $3.4 billion, nearly triple what it was in 2018.[60]

53.     From JUUL's beginnings, Altria had "followed Juul's journey rather closely."[61] Altria Chairman and CEO Howard Willard said that, for years, his company "watched Juul carefully to see if it had staying power."[62] Altria decided it did. As Willard explained: "During 2018, we concluded that JUUL had not only become the retail share leader in the U.S. e-vapor category, but that no other brand was close to it in share or future growth potential."[63] This was enough for Altria, one of the world's largest producers and marketers of tobacco products, to call JUUL's alleged smoking cessation device a "terrific product" and take a 35% stake in the Company with its $12.8 billion investment.[64] With this investment, Altria now owns both the

---

[59] Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth, BusinessWire (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8- Billion-Minority-Investment- JUUL-Accelerate.
[60] Olivia Zaleski & Ellen Huet, Juul Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions, Bloomberg (Feb. 22, 2019), https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing- sales-of-3-4-billion-despite-flavored-vape-ban.
[61] Altria Group, Inc., Current Report (Form 8-K), Ex. 99.1 (Feb. 20, 2019),
[62] Id. at 4.
[63] Id. at 4.
[64] Angelica LaVito, E-Cigarette Sales Are Booming Thanks to Juul, CNBC (Aug. 21, 2018), https://www.cnbc.com/2018/08/21/e-cigarette-sales-are-booming-thanks-to- juul.html.

number one youth initiation cigarette in the United States (the Marlboro cigarette) and the number one youth initiation e-cigarette in the United States, JUUL.

54.     Notwithstanding Altria's statements to the FDA just two months previously about its concerns that JUUL was marketing and advertising its products in a way that contributed to the youth vaping epidemic, Willard stated that the deal would allow Altria to "work[] with JUUL to accelerate its mission."[65] Altria committed to applying "its logistics and distribution experience to help JUUL expand its reach and efficiency" and offering JUUL the support of "Altria's sales organization, which covers approximately 230,000 retail locations." It also gave JUUL access to its "premier" retail shelf space while allowing it to continue to sell its flavored products online and provided JUUL with access to the databases of all of Altria's companies. According to Willard, Altria was "excited to support JUUL's highly-talented team and offer [Altria's] best-in- class services to build on their tremendous success." Altria admitted that minors were using JUUL products and that "underage use of e-cigarette product is a problem." Nevertheless, that it believed its investment in JUUL "strengthens its financial profile and enhances future growth prospects."

55.     Altria's decision to prioritize profits over the dangers of youth vaping did not go unnoticed. On February 6, 2019, former FDA Commissioner Scott Gottlieb, sent Altria another letter "regarding representations" made by Altria acknowledging that it "has an obligation to take action to help address the mounting epidemic of youth addiction to tobacco products."[66] Commissioner Gottlieb told Altria that its recent purchase of a 35% ownership of JUUL "contradict[s] the commitments you made to the FDA." The FDA demanded Altria be prepared to explain itself regarding its "plans to stop marketing e-cigarettes and to address the crisis of youth

---

[65] 65Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth, BusinessWire (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8- Billion-
[66] Scott Gottlieb, Letter to Howard Willard, U.S. Food and Drug Admin. (Feb. 6, 2019), https://www.fda.gov/media/122589/download.

use of e-cigarettes." Commissioner Gottlieb told Altria that "deeply concerning data" shows that "youth use of JUUL represents a significant proportion of overall use of e-cigarette products by children" and despite any steps the companies had taken to address the issue he "ha[d] no reason to believe these youth patterns of use are abating in the near term, and they certainly do not appear to be reversing."

56.     The companies met with Gottlieb in March 2019 in a meeting the Commissioner described as "difficult."[67] Gottlieb "did not come away with any evidence that public health concerns drove Altria's decision to invest in JUUL, and instead sa[id] it looks like a business decision." Just a few weeks later, Gottlieb resigned his position.

57.     As mentioned above, Altria's investment in JUUL is not only a financial contribution. Altria is working to actively help run JUUL's operations and expand JUUL's sales. Altria's investment brings legal and regulatory benefits to JUUL, by helping with patent infringement battles and consumer health claims and helping to navigate the regulatory waters and FDA pressure. Altria also brings lobbying muscle. In addition, Altria's arrangement with JUUL gives JUUL greater access to retail. JUUL has been in 90,000 US retail outlets, while Altria reaches 230,000 US outlets. Altria brings its logistics and distribution experience. Importantly, Altria gives JUUL access to shelf space—and not just shelf space, but space near Altria products and retail displays. The arrangement allows JUUL's tobacco and menthol-based products to receive prominent placement alongside a top-rated brand of combustible cigarettes.

58.     Altria is closely intertwined with JUUL. Not only does Altria's investment also allow it to appoint a third of JUUL's board, but in the last month, JUUL's CEO resigned to be replaced by a career Altria executive, K.C. Crosthwaite. Crosthwaite had most recently served as

---

[67] Kate Rooney and Angelica LaVito, Altria shares fall after FDA's Gottlieb describes 'difficult' meeting on Juul, CNBC (Mar. 19, 2019), https://www.cnbc.com/2019/03/19/altria-shares-fall-after-fdas-gottlieb-describes-difficult-

the vice president and chief growth officer of Altria Client Services LLC, overseeing the company's work, including digital marketing, packaging design & innovation, product development, and safety, health, and environmental affairs. Crosthwaite is a career Altria executive who knows Big Tobacco's playbook all too well, having previously served as the president and CEO of Phillip Morris USA, the vice president and general manager at Marlboro, and the vice president of strategy and business development of at Altria Client Services LLC.

59.     This arrangement was profitable for both companies. JUUL employees received $2 billion in bonuses, which, split among the Company's 1,500 employees, was approximately $1.3 million per employee,[68] and Altria received millions of teen customers.

60.     JUUL claims its mission is to "improve the lives of the world's one billion adult smokers by eliminating cigarettes" and its advertising now encourages "making the switch."[69] Similarly, Altria's CEO Howard Willard claimed that it invested in JUUL to help "switching adult smokers" and "reduce harm."[70] But JUUL does not have FDA approval as a cessation device. This may be because, as one Company engineer said: "We don't think a lot about addiction here because we're not trying to design a cessation product at all … anything about health is not on our mind."[71]

61.     JUUL also does not have authority to claim that its product is healthier than cigarettes. On September 9, 2019, the FDA warned JUUL that has it violated federal law by making unauthorized representations that JUUL products are safer than cigarettes.[72]

62.     Moreover, even if JUUL were to obtain FDA approval as a legitimate smoking

---

[68] Olivia Zaleski, Juul Employees to Get $2 Billion Bonus in Altria Deal, Bloomberg (Dec. 20, 2018), https://www.bloomberg.com/news/articles/2018-12-20/juul-employees-said-to-get-2-billion-bonus-in-altria-deal.
[69] Our Mission, JUUL Labs (2019), https://www.juul.com/mission-values.
[70] Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth, BusinessWire (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8- Billion-Minority-Investment-JUUL-Accelerate.
[71] Nitasha Tiku, Startup Behind the Lambo of Vaporizers Just Launched an Intelligent e-Cigarette, The Verge (Apr. 21, 2015), https://www.theverge.com/2015/4/21/8458629/pax-labs-e-cigarette-juul.
[72] Juul Labs, Inc. Warning Letter, U.S. Food and Drug Admin. (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

cessation device, this has no impact—and certainly does not excuse—the Defendants' conduct that targets youth. Regardless of the potential health benefits to chain smokers from switching to vaping from smoking, there is no benefit to kids from starting to vape.

63.     To be clear, a key part of revenue growth like JUUL's is addicting youth to nicotine, as the tobacco industry has long known. Beginning in the 1950s, JUUL's now corporate affiliate, Philip Morris, intentionally marketed cigarettes to young people under the age of 21 to recruit "replacement smokers" to ensure the economic future of the tobacco industry.[73] Philip Morris knew that youth smoking was essential to the tobacco industry's success and longevity, as an internal Philip Morris document makes clear: "It is important to know as much as possible about teenage smoking patterns and attitudes. Today's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens."[74] For this reason, tobacco companies focused on the 14-24 year-old age group, because "young smokers have been the critical factor in the growth" of tobacco companies and the 14-18 year-old group is an increasing segment of the smoking population.[75] As the Vice-President of Marketing at R.J. Reynolds Tobacco Company ["RJR"] explained in 1974, the "young adult market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume—for at least the next 25 years."[76] RJR's now-infamous Joe Camel "ambassador of Cool" advertising campaign, which ran from 1988 through 1997, exemplifies the importance the tobacco industry placed on hooking young smokers early.[77]

**D.     Each Defendant Was Instrumental in Developing and Marketing the "Most**

---

[73] Amended Final Opinion at 972, U.S. v. Philip Morris, No. 99-cv-2496 (D.D.C. Aug. 17, 2006).
[74] Tobacco Company Quotes on Marketing to Kids, Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.
[75] Id.
[76] C.A. Tucker, Marketing Plans Presentation to RJRI B of D, Truth Tobacco Industry Documents, U. of S.F. (Sept.30, 1974), https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091.
[77] Joe Camel: Character of the Year Advertisement, Stanford U. Res. into the Impact of Tobacco Advert. (1990), http://tobacco.stanford.edu/tobacco_main/images.php?token2=fm_st138.php&token1=fm_img4072.php&theme_file=fm_mt015.php&theme_name=Targeting%20Teens&subtheme_name=Joe%20Camel.

Successful Consumer Product of All Time."

64.     JLI's co-founder, James Monsees, has described the cigarette as "the most successful consumer product of all time."  Despite the fact that cigarettes have caused more deaths than any other invention, this statement rings true.  When U.S. smoking rates peaked in the mid-1960s, 42% of adults smoked cigarettes.  Smoking was commonplace in society, with people smoking on airplanes, movie theaters, in the office, and at sporting events.  Pop-culture idols smoked and endorsed cigarette products, giving them the appearance of glamor, sophistication, and safety.

65.     In reality, the success of cigarettes has long been the world's leading cause of preventable death.

66.     Years of anti-smoking campaigns, including work by local government public health departments and school-based anti-tobacco programs, have made great strides towards denormalizing cigarette smoking.  But where public health officials and school saw progress, others saw an opportunity.

67.     Monsees and JLI co-founder Adam Bowen set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."  Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."  Successfully capitalizing on this opportunity would mean not only billions of dollars in short-term revenue but lucrative acquisition by a cigarette industry power player.

68.     Bowen and Monsees took the first major step toward realizing their vision by deliberately creating an extremely potent nicotine product that looked nothing like a cigarette.  But achieving widespread adoption of their highly addictive product required resources and expertise beyond those possessed by Bowen, Monsees or others at JLI.

69.     When it became clear that Bowen and Monsees could not achieve vision of growing the number of nicotine-addicted e-cigarette users to ensure a base of customers for life through JLI by themselves, the Management Defendants planned a fundamental shift in roles to allow Pritzker, Huh, and Valani to direct and take control of JLI and use it to commit the Defendants' unlawful acts.

70.     Specifically, in October 2015, Monsees stepped down from his role as Chief Executive Officer of JLI (to become Chief Product Officer) and, in his stead, Pritzker, Valani, and Huh formed an Executive Committee of the JLI Board of Directors that would take charge of fraudulently marketing JUUL products, including to youth.

71.     And, as set forth in this complaint, Defendants Bowen, Monsees, Pritzker, Huh, and Valani sought to personally profit from their unlawful acts, using their control of JLI to position the company for acquisition. By no later than August 2015, and likely earlier, Defendant Monsees was in talks with Japan Tobacco International (an early investor in Ploom, JLI's predecessor), British American Tobacco, and Phillip Morris International regarding a potential acquisition of the JUUL business. Monsees had already received "a couple good faith lowball offers" from British American Tobacco and was awaiting a proposal from PMI that month. At the same time, Monsees was looking for "banking support to give an internal tobacco champion the tools to argue for a sizeable deal."

72.     By no later than August 2015, Defendants Bowen, Pritzker, Valani, and Huh joined in the discussions of a potential acquisition by a major cigarette company, as they knew, in the words of Defendant Bowen, "big tobacco is used to paying high multiples for brands and market share."

73.     With smoking on the decline, litigation and regulatory controls were ramping up and threatening Altria's ability to attract new smokers, and JUUL outperforming Altria's products in the market, Altria saw a solution in JLI, with its exponential growth and large youth market. That youth market would be key to replacing Altria's lost profits for years to come. So, Altria Group and Altria Client Services set out to court the leaders of JLI in an eighteen-month dance, all the while signaling that a massive payout would await those leaders if they maintained JLI's large youth market.

74.     Essential to maintaining JLI's large youth market, of course, was delaying or preventing regulation or public outcry that could interfere with Altria's and the Management Defendants' efforts. Altria, with its decades of experience doing just that, aided JLI and the Management Defendants in these efforts along the way, ultimately attempting to deceive the public and the FDA itself in order to defraud users when the specter of regulation threatened the value of its impending investment in late 2018. Altria's best bet for maintaining its sales by increasing the number of users, especially youth, addicted to nicotine was to partner with JLI's leadership (1) to maintain or increase the number of users, especially youth, hooked on JUUL; and (2) to delay and prevent regulation that could interfere with this first scheme.

75.     For those reasons and others, Altria began coordinating with the Management Defendants in the Spring of 2017. And so, with Defendants Bowen, Monsees, Pritzker, Valani, and Huh looking for a big payout, and Altria and Altria Client Services looking for new customers, this group of Defendants began to work together, using JLI to further their unlawful ends, in the Spring of 2017. Of course, these Defendants were not strangers to one another. Before the Spring of 2017, Altria (through Altria Client Services) and JLI were members of at least one industry group that shared information and coordinated public statements regarding

vaping, and Ploom's advisory committee included Altria's former growth officer. Howard Willard, Altria's CEO said, the company followed "JUUL's journey rather closely" from its early beginnings.

76.     By the Fall of 2017, JLI, through its leadership including the Management Defendants, and Altria had agreed to and had taken coordinated actions to maintain and expand JUUL's market share, knowing that it was based on sales to youth and fraudulent and misleading advertising to users of all ages.

77.     The "confidential discussions" continued, with Altria's leadership meeting regularly with Pritzker and Valani for "a period of approximately 18 months." Defendants Pritzker and Valani took the lead on these discussions (together with JLI CEO Kevin Burns), working to establish the formal JLI-Altria partnership. On August 1, 2018, Pritzker, Valani, and JLI's CEO Kevin Burns met Willard and William Gifford, Altria's CFO, at the Park Hyatt Hotel in Washington, D.C., to discuss their partnership and Altria's support of JUUL's mission.

78.     In December 2018, Altria decided to take the next step in its coordination with the Management Defendants and JLI's leadership by making a $12.8 billion equity investment in JLI, the largest equity investment in United States history. This arrangement was profitable for Altria, as well as enormously lucrative for Defendants Monsees, Bowen, Pritzker, Valani, and Huh, as detailed below.

79.     Both before and after Altria's investment, JLI, through its employees and officers, provided Altria with critical information regarding the design and nicotine content of the JUUL product, the labeling of the JUUL product, and related topics including advertising, retail distribution, online sales, age verification procedures, information on underage user's flavor preferences, and regulatory strategies. Altria, for its part, increasingly guided and directed JLI

and the Management Defendants in these areas and helped them devise and execute schemes to preserve JLI's youth appeal and market, including by deceiving users of all ages and regulators.

80.     JLI, the Management Defendants, and Altria worked together to implement their shared goal of growing a youth market in the image of the combustible cigarette market through a multi-pronged strategy to: (1) create an highly addictive product that users would not associate with cigarettes and that would appeal to the lucrative youth market, (2) deceive the public into thinking the product was a fun and safe alternative to cigarettes that would also help smokers quit, (3) actively attract young users through targeted marketing, and (4) use a variety of tools, including false and deceptive statements to the public and regulators, to delay regulation of e-cigarettes. As detailed more fully throughout this Complaint, each of the Defendants played a critical role—at times overlapping and varying over time—in each of these strategies.

**E.     The Secret to JUUL's Success: Hooking Kids**

81.     It is clear that JUUL, like Philip Morris and RJR before it, targeted youth as a key business demographic. A recent study showed that 15-17 year-olds are *16 times* more likely to use JUUL than 25-34 year-olds.[78]

82.     Indeed, JUUL was well aware from the beginning that its products would appeal to youth. A former JUUL manager, who spoke to *The New York Times* on the condition that his name not be used because he worried about facing the ire of the company, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them. Some people bought more JUUL kits on the company's website than they could individually use—sometimes 10 or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was

---

[78] D.M. Vallone et al., Prevalence and correlates of Juul use among a national sample of youth and young adults, Tobacco Control (Oct. 29, 2018), http://dx.doi.org/10.1136/tobaccocontrol-2018-054693.

briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."[79]

83.     This "suspicion" has been confirmed by the U.S. Surgeon General, who found that JUUL's Twitter account was being followed by adolescents and that 25% of those retweeting official JUUL tweets were under 18 years old.[80]

84.     Because of Big Tobacco's demonstrated effectiveness at addicting youth to nicotine, cigarette manufacturers operate under tight restrictions regarding their advertising and marketing activities. By way of example, cigarette companies may not:

    A.     use outdoor advertising such as billboards;

    B.      sponsor events;

    C.     give free samples;

    D.     pay any person to "use, display, make reference to or use as a prop any Tobacco Product, Tobacco Product package . . . in any "Media;"

    E.     pay any third party to conduct any activity which the tobacco manufacturer is prohibited from doing; or

    F.     sell "flavored" cigarettes.

85.     All of these above activities were prohibited because of their effectiveness at appealing to youth. As described below, all of these activities figured prominently in JUUL's marketing campaign.

86.     According to Dr. Robert Jackler, an otolaryngologist and professor at Stanford University School of Medicine and principal investigator for SRITA, JUUL's initial marketing

---

[79] Matt Richtel & Sheila Kaplan, Did Juul Lure Teenagers and Get 'Customers for Life'? N.Y. Times (Aug. 27, 2019), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
[80] Adams, supra note 2.

was "patently youth oriented."[81] The JUUL's 2015 ad campaign, called "Vaporized" was designed to create a "cult-like following."[82] Its imagery featured a vivid color scheme and models in their twenties in poses that researchers note are evocative of behaviors more characteristic of underage teens than mature adults.[83] Dr. Jackler and his colleagues found it "clear" that this image resonated with underage teens who aspire to emulate trendsetting young adults.[84]

87.     Tobacco advertisers have long understood that teens are attracted to such imagery. The Vaporized campaign was featured on the front page of VICE magazine, "the #1 youth media company in the world."[85] In the summer of 2015, an animated series of Vaporized billboards, with the campaign's youth-appealing imagery, were displayed in New York's Times Square.[86] Over the first year after JUUL launched its ad campaign in June 2015, it held a series of at least 50 highly stylized parties, typically with rock music entertainment, in cities across the United States.[87] Thousands of young people were given free nicotine-filled JUULpods (appropriately named "JUUL starter kits"), and JUUL posted photos of various young people enthusiastically puffing on JUULs across their social media channels.[88] JUUL also featured popular stars such as Katy Perry holding a JUUL at the Golden Globes.[89]

88.     JUUL knew these images would be successful in achieving this result because it intentionally crafted them to mimic specific traditional tobacco advertisements that Big Tobacco had used to target teens. In fact, many of JUUL's ads are nearly identical to old cigarette ads that

---

[81] 81 Robert K. Jackler, The Role of the Company in the Juul Teen Epidemic, Testimony of Robert Jackler before the House Subcommittee on Economic and Consumer Policy (July 24, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Jackler%20Testimony.pdf
[82] Id. at 4.
[83] Jackler et al., supra note 25.
[84] Id. at 7.
[85] Id. at 5.
[86] Id.
[87] Id. at 3.
[88] Id.
[89] Jackler Testimony at 8.

were designed to get teens to smoke. Like its Big Tobacco predecessors, the focus of Juul's initial marketing was on colorful ad campaigns using eye-catching designs and youth-oriented imagery with themes of being cool, carefree, stylish, attractive, sexy, and popular—unusual themes and images if one's objective is to promote an adult's only smoking cessation device.

89.     JUUL used Big Tobacco's advertising imagery, but coupled it with a modern, state-of-the-art marketing campaign designed to target youth. It relied heavily on social media, crafting a powerful online presence, which persists even after JUUL deleted its accounts in the face of mounting public scrutiny. JUUL was particularly active on Instagram, which is the most popular social media site among teens.[90] JUUL cultivated hashtags, allowing the Company to blend its ads in with wide range of user content, increasing exposure while concealing the commercial nature of the content.[91] JUUL then used hashtags to reinforce the themes it crafted in its product design, like #style, #technology, #smart, and #gadget. JUUL's hashtags attracted an enormous community of youthful posts on a wide array of subjects. According to Dr. Jackler, #Juul contains literally thousands of juvenile postings, and numerous Instagram hashtags contain the JUUL brand name.[92] Even after JUUL halted its own social media posts in November 2018, viral peer-to-peer promotion among teens insured continued corporate and product visibility among youth.[93] In fact, community posts about JUUL increased after JUUL itself quit social media in the Fall of 2018. Prior to November 2018, over a quarter of a million posts appeared. In the eight months *after* JUUL halted its promotional postings, the rate of community postings increased significantly, resulting in the number of posts doubling to over half a million.[94]

90.     JUUL also paid social media influencers to post photos of themselves with JUUL

---

[90] Jackler et al., supra note 25.
[91] Id. at 23
[92] Jackler Testimony at 10.
[93] Id. at 11.
[94] Id.

devices and to use the hashtags that it was cultivating.[95] JUUL entered a contract with an advertising agency specifically to identify and recruit social media influencers that had at least 30,000 followers to, according to an internal JUUL email, "establish a network of creatives to leverage as loyalists" for the JUUL brand.[96] One such influencer was Christina Zayas, whom JUUL paid $1,000 for just one blog post and one Instagram post in the Fall of 2017.[97]

91.    JUUL instituted an "affiliate program" to recruit those who authored favorable reviews of its products by providing such reviewers with a 20% discount of purchases of JUUL products.[98] It even recruited JUUL users to act as part of their marketing team by asking users to "refer a friend and get a discount."[99]

92.    Such tactics masked what were, in fact, JUUL advertisements as user content, further increasing exposure and ultimately solidifying the company in teen pop culture as a form of cultural currency. JUUL's strategy was so successful in embedding its products into pop culture that it entered the vernacular as a verb. The JUUL device and the term "juuling" are so pervasive that JUUL effectively eliminated not only competitors, but also any potentially alarming terms like "smoking" or "e-cigarette," which could alert users of the true nature of the device or activity. A recent study found that 63% of adolescent JUUL users did not know that JUULpods contain nicotine.[100] This has worked to JUUL's advantage and was, in fact, a deliberate part of the its strategy. In the first year after its launch, not one of JUUL's 171 promotional emails said anything

---

[95] Jackler et al., Juul Advertising Over Its First Three Years On The Market, Stanford Res. into the Impact of Tobacco Advert. (Jan. 31, 2019), supra note 25.
[96] Kenrick Cai, Juul Funded High Schools, Recruited Social Media Influencers To Reach Youth, House Panel Charges, Forbes (July 25, 2019), https://www.forbes.com/sites/kenrickcai/2019/07/25/juul-high-schools-influencers-reach-youth-house-investigation/#57735a4a33e2
[97] Michael Nedelman et al., #Juul: How social media hyped nicotine for a new generation, CNN Health (Dec.19,2018), https://www.cnn.com/2018/12/17/health/juul-social-media-influencers/index.html.
[98] Id at 9-10.
[99] Id. at 9.
[100] Juul e-Cigarettes Gain Popularity Among youth, But Awareness of Nicotine Presence Remains Low, Truth Initiative (Apr. 18, 2018), https://truthinitiative.org/sites/default/files/media/files/2019/03/JUUL-E-cigarettes-Gain-Popularity-Among-Youth-But-Awareness-of-Nicotine-Presence-Remains-Low.pdf.

about nicotine content,[101] and the it did not include nicotine warnings on the JUUL packaging until August 2018, when it was forced to do so.

93.     The design of JUUL's product is also acutely attractive to youth. Unlike most of its predecessors, JUUL looks nothing like a cigarette. Instead, JUUL is sleek and linear and seems like the latest tech invention. This is not surprising, given the founders' Silicon Valley product design education and training. The evocation of technology makes JUUL device familiar and desirable to the younger tech-savvy generation, particularly teenagers. The JUUL device even has features reminiscent of youth-oriented tech culture and gaming, like "secret" features users can unlock, such as making the indicator light flash rainbow colors in "party mode." JUUL has been so successful in emulating technology that the small, rectangular devices are often mistaken for—or passed off as—flash drives.

94.     The ability to conceal a JUUL is also part of the appeal for adolescents. The devices are small and slim, so they fit easily in a closed hand or a pocket. The ease and simplicity of use— there is nothing to light or unwrap, not even an on-off switch—also make it possible to covertly use a JUUL behind a turned back, which has become a trend in many schools. Finding new ways to hide the ever-concealable JUUL has spawned products designed just for that purpose, such as apparel that allows the wearer to use the device while it is concealed in the drawstring of a hoodie or the strap of a backpack.[102]

95.     JUUL also created special flavors that make its addictive, high-tech device even more attractive to adolescents. Tobacco companies have known for decades that flavored products are key to nicotine adoption by youth. A 1972 Brown & Williamson memorandum: "Youth

---

[101] Jackler et al., supra note 25 at 25.
[102] Evie Blad, 'Juuling' and Teenagers: 3 Things Principals and Teachers Need to Know, Educ. Wk. (July18, 2018), https://www.edweek.org/ew/articles/2018/07/18/juuling-and-teenagers-3-things-principals-and.html.

Cigarette – New Concepts," specifically noted the "well known fact that teenagers like sweet products."[103] A 1979 Lorillard memorandum concluded that younger customers would be "attracted to products with 'less tobacco taste," and even proposed borrowing data from the "Life Savers" candy company to determine which flavors enjoyed the widest appeal among youth.[104] According to 2004 data, 17 year old smokers were more than three times likely as those over 25 to smoke flavored cigarettes and viewed flavored cigarettes as safer.[105] For this reason, in 2009 the FDA banned flavored cigarettes pursuant to its new authority under the Family Smoking Prevention and Tobacco Control Act of 2009. In announcing the ban, FDA Commissioner Dr. Margaret Hamburg declared that "flavored cigarettes are a gateway for many children and young adults to become regulator smokers."[106]

96.     There is no reason to believe that flavors play any different role with respect to e-cigarettes and youth. In fact, a 2017 study of the cigarette flavor ban found that the ban was effective in lowering the number of smokers and the amount smoked by smokers, though it was associated with an increased use of menthol cigarettes (the only flavor still available).[107] According to the Surgeon General, 85% of adolescents who use e-cigarettes use flavored varieties.[108] Studies also show that flavors motivate e-cigarette initiation among youth,[109] and that youth are much more

---

[103] September 1972 memorandum to Brown & Williamson from Marketing Innovations, "Youth Cigarette - New Concepts." Bates No. 170042014.

[104] Lorillard memo on sale of Newport cigarettes, 1978 Bates No. 03537131-03537132 EXHIBIT 101

[105] Gardiner Harris, Flavors Banned From Cigarettes to Deter Youth, N.Y. Times (Sept. 22, 2009) https://www.nytimes.com/2009/09/23/health/policy/23fda.html.

[106] Id.

[107] https://tobacco.ucsf.edu/more-evidence-support-eliminating-flavors-reduce-youth-cigarette-and-e-cigarette-use; referencing Courtemanche, Charles J. et al. Influence of the Flavored Cigarette Ban on Adolescent Tobacco Use, American Journal of Preventive Medicine 2017; 52(5):e139 - e146; and MB. Harrell, et al. Flavored e-cigarette use: Characterizing youth, young adult, and adult users. Prev Med Rep. 2017; 5: 33–40. Published online 2016 Nov 11. doi: 10.1016/j.pmedr.2016.11.001 PMCID: PMC5121224.

[108] E-Cigarette Use Among Youth and Young Adults, U.S. Dept. of Health and Human Services (2016),https://www.ctclearinghouse.org/Customer-Content/www/topics/2444-E-Cigarette-Use-Among-Youth-And-Young-Adults.pdf (accessed Oct. 4, 2019).

[109] Karl Paul, Flavored Vapes Lure Teens Into Smoking and Nicotine Addiction, Study Shows, MarketWatch

likely to use flavored tobacco products than adults are.[110] In fact, in September 2019, the State of Michigan banned flavored e-cigarettes, a step the governor said was needed to protect young people from the potentially harmful effects of vaping, Governor Andrew Cuomo of New York announced that he would pursue emergency regulations to ban the sale of flavored e-cigarettes, and Governor Jay Inslee of Washington State ordered the Washington State Department of Health to ban all flavored vapor products.[111,112] Despite JUUL's claims that its target market is adult smokers, the Company entered the market with flavors like Cool Mint, Crème Brulee, Fruit Medley, Cucumber, and Mango. These flavors were the reason countless adolescents started using JUUL products.

97.     The flavors pose dangers beyond luring young people into trying nicotine. Studies now show these sweet and fruity flavors present distinct additional health hazards. Researchers have found that some of the chemicals JUUL uses for flavor and perfume—particularly in the Crème Brulee flavor—contain relatively high levels of acetals.[113] Acetals are airway-irritating chemicals that may cause lung damage.[114] Dr. Robert Jackler said that test results have shown that JUUL's sweet and fruity flavors "contribute[d] to the increasing body of evidence documenting toxicological effects of e-cig vapor."[115]

## F.     The Cost of JUUL's Success

98.     In addition to designing its devices to be particularly attractive to youth, JUUL

---

(Feb.26, 2019), https://www.marketwatch.com/story/flavored-vapes-lure-teens-into-smoking-and-nicotine-addiction- study- shows-2019-02-25.

[110] AC Villanti et al., Flavored Tobacco Product Use in Youth and Adults: Findings From the First Wave of the PATH Study, 53 Am. J. of Preventative Med. 139 (2017), https://www.ncbi.nlm.nih.gov/pubmed/28318902.

[111] Jesse McKinley & Christina Goldbaum, New York Moves to Ban Flavored E-Cigarettes by Emergency Order, N.Y.Times (Sept. 15, 2019), https://www.nytimes.com/2019/09/15/nyregion/vaping-ban-ny.html?smid=nytcore-ios-share.

[112] https://www.governor.wa.gov/sites/default/files/19-03%20-%20Addressing%20the%20Vaping%20Public%20Health%20Crisis%20%28tmp%29.pdf?utm_medium=email&utm_source=govdelivery.

[113] Susie Neilson, Irritating Compounds Can Show Up in 'Vape Juice', NPR (July 30, 2019), https://www.npr.org/sections/health-shots/2019/07/30/746238009/irritating-compounds-discovered-in-vape-juice.

[114] Id.

[115] Id.

designed its devices to be highly addictive. Unlike most other e-cigarettes, which use freebase nicotine, JUUL uses patented nicotine salts from which it makes liquid nicotine cartridges, or JUULpods.[116] Each JUULpod is, according to the Company, the equivalent of a pack of cigarettes. Each pod contains an alarming amount of nicotine, with up to 59 mg per ml—an amount that is roughly three times the amount of nicotine that can be sold to consumers in the European Union in a JUULpod. On top of ramping up the amount of nicotine, JUULpods enabled the Company to increase the rate and amount of nicotine delivery to the JUUL user, roughly doubling the concentration and tripling the delivery speed of nicotine of the average e-cigarette.[117]

99.     Big Tobacco spent decades manipulating nicotine in order to foster and maintain addiction in their customers. RJR developed and patented nicotine salt additives, including nicotine benzoate, to increase nicotine delivery in cigarette smoke. The objective was to provide an additional "nicotine kick" based on increased nicotine absorption associated with lower pH. JUUL uses this very same concept for its market-dominating e-cigarettes. The Company's patent for its nicotine salts describes a process for combining benzoic acids with nicotine, a formulation that mimics the nicotine salt additive developed by RJR. JUUL's use of benzoic acid and manipulation of pH affect the palatability of nicotine inhalation by reducing the "throat hit" that users experience when vaping. Indeed, this was the objective behind using nicotine salts (as compared to "freebase nicotine" which has a higher pH). According to Ari Atkins, one of the inventors of the JUUL device, "[i]n the tobacco plant, there are these organic acids that naturally occur. And they help stabilize the nicotine in such a way that makes it . . . I've got to choose my

---

[116] Rachel Becker, *Juul's Nicotine Salts Are Dominating the Market – And Other Companies Want In*, The Verge (Nov. 21, 2018), https://www.theverge.com/2018/11/21/18105969/juul-vaping-nicotine-salts-electronic- cigarettes-myblu-vuse-markten.

[117] *How Much Nicotine is In Juul?*, Truth Initiative (Feb. 26, 2019), https://truthinitiative.org/research-resources/emerging-tobacco-products/how-much-nicotine-juul.

words carefully here: Appropriate for inhalation."[118]

100.    Because smokers are already accustomed to a certain level of harshness and throat hit, developing a product with low levels of harshness and minimal "throat hit" is only a critical concern if your goal is to appeal to non-smokers, for example, youth. Minimizing the harshness of nicotine also allows one to vape more frequently and for longer periods of time and masks the amount of nicotine being delivered by eliminating the unpleasant throat hit normally associated with large doses of nicotine. The harshness of freebase nicotine makes prolonged vaping difficult; the use of nicotine salts solves that problem. Put another way, the nicotine salt technology behind JUULpods makes JUUL "smoke" highly potent yet hardly perceptible.

101.    The increased nicotine exposure facilitated by the JUUL device has serious health consequences. The ease of use and "smoothness" strip away external inhibitors and enable extreme levels of unfettered use. Using the JUUL's own calculations, consuming two JUULpods in a day is the equivalent of consuming two to four packs of cigarettes a day. In this way, JUUL has not only created a new generation of e-cigarette smokers but has also pioneered a new style of smoking— vaping—that is more nicotine-saturated than ever before.

102.    Increased rates and duration of smoking lead to greater overall exposure to nicotine. Nicotine is a neurotoxin. A highly addictive, psychoactive substance that targets brain areas involved in emotional and cognitive processing, nicotine poses a particularly potent threat to the adolescent brain, as it can "derange the normal course of brain maturation and have lasting consequences for cognitive ability, mental health, and even personality."[119] Studies also show that

---

[118] David Pierce, This Might Just Be the First Great E-Cig, Wired.com (Apr. 21, 2015), https://www.wired.com/2015/04/pax-juul-ecig/.
[119] N.A. Goriounova & H.D. Mansvelder, Short- and Long-Term Consequences of Nicotine Exposure during Adolescence for Prefrontal Cortex Neuronal Network Function, Cold Spring Harbor Persp. in Med. 2(12) (Dec. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069/.

exposure to nicotine as a teen—even minimal exposure—biologically primes the brain for addiction and greatly increases likelihood of dependence on nicotine as well as other substances later in life.[120]

103.    According to congressional testimony from Dr. Jonathan Winickoff, a professor of pediatrics at Harvard Medical School and the Director of Pediatric Research in the Tobacco Research and Treatment Center, "[n]icotine addiction can take hold in only a few days, especially in the developing adolescent brain that is particularly vulnerable to addiction to nicotine. . . Many of my patients find Juul nearly impossible to stop. Nicotine withdrawal can cause headaches, insomnia, irritability, anxiety, and depression, and these withdrawal symptoms are one of the primary reasons a nicotine addiction is difficult to overcome."[121] Moreover, there is a lack of effective tools to help adolescents overcome nicotine addiction: there is no good data on how to treat adolescents with e-cigarette dependence; there has not been enough research on youth tobacco cessation strategies; and most of the pharmacological therapies approved for adults have been shown to be ineffective or only marginally effective in adolescents.[122]

104.    Research in Massachusetts indicates that daily JUUL and other e-cigarette use is much more likely to continue than daily cigarette smoking. Out of the surveyed students who reported ever using cigarettes, only 17% indicated that they remained daily smokers. Out of the surveyed students who reported ever using e-cigarettes daily, 58% remained daily users. This data demonstrates both that e-cigarette use in teens is very persistent, a result consistent with the

---

[120] National Institute on Drug Abuse, Principles of Adolescent Substance Use Disorder: A Research Based Guide (2014),https://www.drugabuse.gov/publications/principles-adolescent-substance-use-disorder-treatment-research-based-guide/introduction.
[121] Jonathan Winickoff, Testimony of Jonathan Winickoff before the U.S. House of Representatives Committeeon Oversight and Reform Subcommittee on Economic and Consumer Policy ("Winickoff Testimony") at 2, U.S. House Committee on Oversight & Reform (July 24, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Winickoff%20AAP%20Testimony.pdf.
[122] Id.

addictiveness of JUUL and the difficulty teens have in trying to quit.[123]

105.    E-cigarette use also puts adolescents at increased risk for cigarette smoking. Compared to adolescents who do not use e-cigarettes, those who do are 3.5 times more likely to begin smoking cigarettes.

106.    The dangerous and destructive nature of nicotine is no recent discovery. As a key ingredient in tobacco products, the drug and its deleterious effects have been the subject of scientific research and public health warnings for decades. Nicotine causes cardiovascular, reproductive, and immunosuppressive problems with devastating effects. Part of the reason the national decline in cigarette use in recent years was such a victory for public health was because there was a corresponding decline in teen exposure to nicotine. From 2000 to 2017, the smoking rate among high school students fell by 73%.[124]

107.    That trend has completely reversed. In 2018, more than one in four high school students in the United States reported using a tobacco product in the past thirty days, a dramatic increase from just one year before.[125] But there was no increase in the use of cigarettes, cigars, or hookahs during that same time period.[126] There was only increased use in a single tobacco product: e-cigarettes. While use of all other tobacco products continued to decrease as it had been for decades, e-cigarette use increased 78% in just one year.[127] This drastic reversal caused the CDC

---

[123] Id.

[124] Matthew L. Myers, Press Release: On 20th Anniversary of State Tobacco Settlement (the MSA), It's Time for Bold Action to Finish the Fight Against Tobacco, Campaign for Tobacco-Free Kids (Nov. 26, 2018), https://www.tobaccofreekids.org/press-releases/2018_11_26_msa20.

[125] Progress Erased: Youth Tobacco Use Increased During 2017-2018, Ctrs. for Disease Control and Prevention, (Feb. 11, 2019), https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html.

[126] Tobacco Use By Youth Is Rising: E-Cigarettes are the Main Reason, Ctrs. for Disease Control & Prevention (Feb. 2019), https://www.cdc.gov/vitalsigns/youth-tobacco-use/index.html.

[127] Scott Gottlieb, Statement from FDA Commissioner Scott Gottlieb, M.D., on proposed new steps to protect youth by preventing access to flavored tobacco products and banning menthol in cigarettes, U.S. Food & Drug Admin. (Nov. 15, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-proposed-new-steps-protect-youth-preventing-access.

to describe youth vaping an "epidemic."[128]

108.    The teen vaping epidemic of which JUUL is the architect has and will continue to have significant costs, both for individual users and for society. Nicotine addiction alone has significant health care costs, and these costs are exacerbated when adolescents are involved. Adolescent nicotine addiction leads to memory and attention problems, and increase chances of addiction later in life, all of which will continue to have long-lasting impacts on society.

109.    Science is also beginning to show that e-cigarettes have the potential to cause even more distinct health risks and costs. The very same liquids that enable e-cigarettes to deliver nicotine with such potency are proving to be increasingly dangerous. When heated, the vape liquid turns into aerosol, which may contain, in addition to nicotine, ultrafine toxic particles such as lead, additional chemicals, and volatile organic compounds.[129] These chemicals have the potential to be deadly. Vaping is now linked to conditions like chronic obstructive pulmonary disease and seizures, and there were 193 possible cases of severe lung illness associated with e- cigarette product use in 22 states in less than two months in the summer of 2019 alone.[130] Public health officials reported the first known death from a vaping-related illness on August 23, 2019.[131] By early October 2019, lung illness tied to vaping had killed 19 people, and there are now over 1,000 possible cases of serious illness reported from 48 states, including in Mississippi.[132] 16% of these patients have been under the age of 18.[133]

---

[128] Adams, supra note 2.
[129] Lena H. Sun, He went from hiking enthusiast to 'on death's door' within days. Doctors blamed vaping, Wash. Post (Aug. 24, 2019), https://www.washingtonpost.com/health/one-mans-near-death-experience-with- vaping-related-lung-failure/2019/08/24/ca8ce42c-c5b4-11e9-9986-1fb3e4397be4_story.html?arc404=true.
[130] CDC, FDA, States Continue to Investigate Severe Pulmonary Disease Among People Who Use E-cigarettes, Ctrs. for Disease Control & Prevention (Aug. 21, 2019), https://www.cdc.gov/media/releases/2019/s0821-cdc-fda-states- e-cigarettes.html.
[131] Matt Richtel & Sheila Kaplan, First Death in a Spate of Vaping Sicknesses Reported by Health Officials, N.Y. Times (Aug. 23, 2019), https://www.nytimes.com/2019/08/23/health/vaping-death-cdc.html.
[132] Denise Grady, Vaping Illnesses Top 1,000, C.D.C., N.Y. Times (Oct. 3, 2019), https://www.nytimes.com/2019/10/03/health/vaping-illnesses-cdc.html.
[133] Id.

110.    Many teenagers are simply unaware of these risks, an ignorance that JUUL preys on. According to Dr. Winickoff, many of his patients believe JUULing is harmless:

> Counseling teens and preteens on e-cigarette use is challenging. Many of my patients have wildly incorrect beliefs about e-cigarettes. They know that cigarettes are dangerous, but assume that Juul—since it's ubiquitous, comes in child-friendly flavors, and is marketed as a healthier alternative to smoking— must be harmless. I have to explain to kids that e-cigarettes do not have the same positive health benefits as the fruits whose flavor they copy. Even the term vapor calls to mind harmless water vapor. There is no water in these products.

Winickoff Testimony at 1.

## G.    JUUL's Remedial Measures

111.    In the face of increasing public scrutiny and pressure, JUUL has taken action to curb underage use of its products, but its efforts have been ineffective at best and aggravating at worse. After media and researchers brought JUUL's advertising tactics front and center, it launched a new ad campaign focusing on former smokers and deleted social media accounts. But, JUUL designed its social media campaign to subsist off of user-made content, which remains unaffected by the absence of a JUUL-run account. In fact, as noted above, posts relating to JUUL increased after it stopped its direct social advertising campaign.

112.    JUUL's efforts to curb underage use through alterations to the product itself are similarly either ineffective or potentially damaging. JUUL's approach to its flavored products illustrates this point. In response to serious concerns about flavored products and youth vaping, JUUL did the following: (1) it slightly modified the flavor names (i.e., "Cool Mint" is now "Mint," "Crème Brulee" is now "Creme"); and (2) it limited the flavors carried by retail stores to tobacco and mint, while continuing to offer the full range of flavors (including popular ones such as Mango) online—a market which teens are particularly aware and adept at navigating. As Dr. Winickoff testified before Congress:

> [it is] completely false to suggest that mint is not an attractive flavor to children.

> From candy canes to toothpaste, children are introduced to mint flavor from a young age. Not only do children enjoy mint, but it has special properties that make it an especially dangerous flavor for tobacco. Menthol's anesthetic properties cool the throat, mask the harshness of nicotine, and make it easier for children to start using and continue using tobacco products. The impact of mint and menthol flavors on increasing youth tobacco addiction is well documented.

Winickoff Testimony at 3.

113.    Similarly, restricting other flavors to online sales is of limited effectiveness. According to Dr. Winickoff, 80% of children get e-cigarettes from social sources, such as older friends, meaning that if the products are available for sale somewhere, children will get them.[134]

## H.    JUUL and Schools

114.    In addition to severe health consequences, widespread "JUULing" has placed severe burdens on society and schools in particular. It is not an overstatement to say that JUUL has changed the educational experience of students across the nation. As one vape shop manager told KOMO News, "It's the new high school thing. Everyone's got the JUUL."[135]

115.    JUUL use has completely changed school bathrooms—now known as "the Juul room."[136] As one high school student explained, "it's just a cloud."[137] The ubiquity of JUUL use in high school bathrooms has generated numerous online spoofs about "the juul room."

116.    Kids have also coined the term "nic sick"—which, as one high school student explained to CBS News, "kinda seems like a really bad flu, like, just out of nowhere. Your face goes pale, you start throwing up and stuff, and you just feel horrible."[138]

---

[134] Id.

[135] Juuling at School, KOMO News (2019), https://komonews.com/news/healthworks/dangerous-teen-trend- juuling-

[136] Moriah Balingit, In the 'Juul room': E-cigarettes spawn a form of teen addiction that worries doctors, parents and schools, Washington Post (Jul. 26, 2019), https://www.washingtonpost.com/local/education/helpless-to-the- draw-of-nicotine-doctors-parents-and-schools-grapple-with-teens-addicted-to-e-cigarettes/2019/07/25/e1e8ac9c- 830a-11e9-933d-7501070ee669_story.html.

[137] Greta Jochem, Juuling in School: e-Cigarette Use Prevalent Among Local Youth, Daily Hampshire Gazette (Nov. 13, 2018), https://www.gazettenet.com/Juuling-in-Schools-21439655.

[138] High school students say about 20% of their peers are vaping, some as young as 8th grade, CBS News (Aug. 31, 2019), https://www.cbsnews.com/news/high-school-students-say-about-20-of-their-peers-are-vaping-some-as-

117.    Such rampant JUUL use has effectively added another category to teachers' and school administrators' job descriptions; many now receive special training to respond to the various problems that JUUL use presents, both in and out of the classroom. A national survey of middle schools and high schools found that 43.3% of schools have had to implement not only an e-cigarette policy but a JUUL-specific policy.[139] Participants in the survey reported multiple barriers to enforcing these policies, including the discreet appearance of the product, difficulty pinpointing the vapor or scent, and the addictive nature of the product.[140]

118.    Across the United States, schools have had to divert resources and administrators have had to go to extreme lengths to respond to the ever-growing number of students using JUULs on school grounds. According to the Truth Initiative, more than 40 percent of all teachers and administrators reported that their school uses camera surveillance near the school's restroom, almost half (46 percent) reported camera surveillance elsewhere in the school, and 23 percent reported using assigned teachers for restroom surveillance.[141] Some schools have responded by removing bathroom doors or even shutting bathrooms down,[142] and schools have banned flash drives to avoid any confusion between flash drives and JUULs.[143] Schools have also paid thousands of dollars to install special monitors to detect vaping, which they say is a small price to

---

young-as-8th-grade/.

[139] Barbara A. Schillo, et al., JUUL in School: Teacher and Administrator Awareness and Policies of E-Cigarettes and JUUL in U.S. Middle and High Schools, Truth Initiative (Sep. 2019), https://journals.sagepub.com/doi/full/10.1177/1524839919868222?url_ver=Z39.88-2003&rfr_id=ori:rid:crossref.org&rfr_dat=cr_pub%3dpubmed

[140] Id.

[141] How are schools responding to JUUL and the youth e-cigarette epidemic?, Truth Initiative, (Jan. 18, 2019) https://truthinitiative.org/research-resources/emerging-tobacco-products/how-are-schools-responding-juul-and-youth- e-cigarette

[142] Ana B. Ibarra, The Juul's So Cool, Kids Smoke It In School, Kaiser Health News (Mar. 26, 2018),https://khn.org/news/the-juuls-so-cool-kids-smoke-it-in-school/; Evie Blad, 'Juuling' Craze: Schools Scramble to Deal With Student Vaping, Educ. Wk. (May 4, 2018), https://www.edweek.org/ew/articles/2018/05/09/juuling-craze-schools-scramble-to-deal-with.html.

[143] Anna B. Ibarra, Why 'juuling' has become a nightmare for school administrators, Kaiser Health News (Mar. 2018),https://www.nbcnews.com/health/kids-health/why-juuling-has-become-nightmare-school-administrators-n860106.

pay compared to the plumbing repairs otherwise spent as a result of students flushing vaping paraphernalia down toilets.[144] Other school districts have sought state grant money to create new positions for tobacco prevention supervisors, who get phone alerts when vape smoke is detected in bathrooms.[145]

119.   Many schools have shifted their disciplinary policies in order to effectively address the JUUL epidemic. Rather than immediately suspending students for a first offense, school districts have created anti-vaping curricula which students are required to follow in sessions held outside of normal school hours, including on Saturdays.[146] Teachers prepare lessons and study materials for these sessions with information on the marketing and health dangers of vaping[147]— extra work which requires teachers to work atypical hours early in the mornings and on weekends.[148] Some schools will increase their drug testing budget to include random nicotine tests for students before they join extracurricular activities.[149] Under this drug- testing protocol, first offenders will undergo drug and alcohol educational programming; second and third offenders with be forced to sit out from extracurriculars and attend substance abuse counseling.[150]

120.   JUUL actively sought to enter school campuses. The Subcommittee on Economic and Consumer Policy ("Subcommittee") conducted a months-long investigation of JUUL, including reviewing tens of thousands of internal documents, and concluded that JUUL

---

[144] Suzanne Monaghan, Many schools installing vape detectors in bathrooms to discourage e-cigarette use, KYWNewsradio (June 10, 2019), https://kywnewsradio.radio.com/articles/news/many-schools-installing-vape-detectors-bathrooms-address-rise-e-cigarette-use.
[145] Lauren Katims, California Fights Vaping in Schools, U.S. News & World Report (Apr. 30, 2019),https://www.usnews.com/news/best-states/articles/2019-04-30/california-focuses-on-education-to-curb-vaping- in-schools.
[146] Id.
[147] Pat Eaton-Robb, Discipline or treatment? Schools rethinking vaping response, Concord Monitor (May 26, 2019), https://www.concordmonitor.com/Discipline-or-treatment-Schools-rethinking-vaping-response-25822972.
[148] Kathy Brown, School trustees OK discipline for juuling/vaping offenses, Gillette News Record (Aug. 29, 2019), https://www.gillettenewsrecord.com/news/local/article_5ec28c96-fd48-5ae0-b267-4e417272d020.html.
[149] Christine Hauser, This School District Has a Way to Combat Vaping: Random Nicotine Tests, N.Y. Times (June 17, 2019), https://www.nytimes.com/2019/06/17/us/nebraska-vaping-schools.html.
[150] Id.

"deliberately targeted children in order to become the nation's largest seller of e-cigarettes."[151] The Subcommittee found that "(1) Juul deployed a sophisticated program to enter schools and convey its messaging directly to teenage children; (2) Juul also targeted teenagers and children, as young as eight years-old, in summer camps and public out-of-school programs; and (3) Juul recruited thousands of online "influencers" to market to teens."[152]

121.     According to the Subcommittee, JUUL was willing to pay schools and organizations hundreds of thousands of dollars to have more direct access to kids. Such attempts included paying a Baltimore charter school organization $134,000 to start a summer camp to teach kids healthy lifestyles, for which JUUL itself would provide the curriculum; offering schools $10,000 to talk to students on campus; and giving the Police Activities League in Richmond, California, $90,000 to provide JUUL's own vaping education program, "Moving On," to teenage students suspended for using cigarettes.[153] Meanwhile, JUUL would collect data about test scores, surveys, and activity logs about the students.

122.     Among the more egregious incidents reported by the Subcommittee was a July 24, 2019 presentation in which no parents or teachers were in the room for the presentation, the message conveyed was that the JUUL product was "totally safe," and the presenter even demonstrated to the students how to use a JUUL.[154] The school was presumably paid for this meeting, which was marketed to the school as an anti-smoking initiative. A JUUL spokesman said JUUL is no longer funding such programs.[155]

---

[151] Supplemental Memorandum for Hearing on 'Examining JUUL's Role in the Youth Nicotine Epidemic: Parts I & II' from Committee Staff, to Democratic Members of the Subcommittee on Economic and Consumer Policy (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.
[152] Id. at 1.
[153] Sheila Kaplan, Juul Targeted Schools and Youth Camps, House Panel on Vaping Claims, N.Y. Times (Jul. 25, 2019), https://www.nytimes.com/2019/07/25/health/juul-teens-vaping.html.
[154] Supplemental Memorandum for Hearing on 'Examining JUUL's Role in the Youth Nicotine Epidemic: Parts I &II' from Committee Staff, to Democratic Members of the Subcommittee on Economic and Consumer Policy (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.
[155] Id.

I.      **Impact on Forest Hills School District**

123.    The residents, parents and students of the School District have been plagued by the youth vaping epidemic and have been directly affected by the surge in youth vaping caused by Defendants' misconduct.  The School District continues to incur the increased costs to address and respond to the youth vaping epidemic.

124.    The School District is comprised of Forest Hills Elementary School and Forest Hills Junior-Senior High School. Each of these schools have administrators, teachers, school nurses, counselors and other education related staff members, along with custodians, secretaries and other staff members who are responsible for the day-to-day operations and maintenance of the schools.

125.    In addition, the School District employs a number of school police officers and an additional number of security guards who are responsible for the safety and security of the School District, its employees, students and visitors.  As part of their daily responsibilities, the School District's school police officers and security guards work with the Administration to address student conduct that violates School District policy and/or Federal and State laws.

126.    The School District's employees have witnessed countless ways in which the use of Defendants' products by its students has negatively impacted the School District, including, but not limited to the impact upon curriculum and development; class time; increased time spent addressing discipline and supervision issues; and, increased counselor time spent with addicted students and peers who are concerned about this epidemic.

127.    The School's police officers and security guards have had to spend increased time responding to student JUUL use.  Due to the pervasive use of JUUL products on the School District's property, School District employees have been forced to spend more time physically supervising students to ensure that they are not using JUUL products. The School District's

employees are also spending significantly more time addressing discipline problems related to JUUL use.

128.    Counselors at the School District are now facing the reality of spending time discussing JUUL use with students and trying to help students who have become addicted. Students are now beginning to tell counselors that they are concerned about their peers using JUUL and are afraid because the students do not know what they are putting in their bodies.

129.    To fully address the harms caused to the School District by Defendants' conduct will require a comprehensive approach, one that includes addiction counselors in schools; prevention education that includes information about the health consequences of JUUL use on adolescents' bodies and minds; the development of refusal and other skills within the students; and, addiction treatment options.

130.    Without the resources to fund these measures, the School District and others similarly situated school districts will continue to be harmed by the ongoing consequences of Defendants' conduct.

## IV.  CAUSES OF ACTION
## COUNT I – PUBLIC NUISANCE

131.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

132.    Defendants' design, manufacture, production, marketing, distribution, and sale of highly-addictive and harmful e-cigarettes and nicotine pods, when such actions were taken with the intent to market and, in fact, were marketed to youth through repeated misstatements and omissions of material fact, unreasonably interfered with a public right in that results of Defendants' actions created and maintained a condition dangerous to the public's health, was offensive to

community moral standard, or unlawfully obstructed the public in free use of public property.

Defendant intentionally created and maintained a public nuisance by, among other acts:

A.  Designing a product that was uniquely youth-oriented in design, resembling a common USB flash drive;

B.  Designing a product that was meant to facilitate underage use, both generally and  by enabling easy concealment of Defendant's e-cigarette in school;

C.  Designing a product with a nicotine delivery system that results in a quicker and more potent dose of nicotine to its users;

D.  Designing a product with as little irritation to a user's throat, like that experienced from smoking a combustible cigarette, as possible to facilitate initiation of nicotine use by youth and non-smokers;

E.  Marketing highly-addictive nicotine products to youth, who are, because of their age and lack of experience, particularly susceptible to Defendant's targeted marketing preying on their need for social acceptance;

F.  Marketing a nicotine product to a population—youth—that, because of their developmental stage, is more susceptible to nicotine addiction;

G.  Marketing nicotine products to a population—youth—that faces an increased risk  of adverse mental and physical health impacts from nicotine use; and

H.  Actively seeking to enter school campuses, targeting children as young as eight   through summer camps and school programs, extensively targeting youth through social media campaigns, and recruiting "influencers" to market to teens;

I.  Engaging in marketing tactics specifically designed to mislead children and youth and to ensnare minors into nicotine addiction, including by explicitly adopting tactics prohibited from Big Tobacco, with the knowledge that those tactics were likely to ensnare children and youth into nicotine addiction, including using billboards and outdoor advertising, sponsoring events, giving free samples, paying affiliates and "influencers" to push JUUL products on JUUL's behalf, and by selling JUUL in flavors designed to appeal to youth;

J.  Engaging in advertising modeled on cigarette ads and featuring youthful-appearing models and designing advertising in a patently youth-oriented

fashion;

K.      Directing advertising to youth media outlets and media designed to appeal to children and youth, such as Instagram and other social media channels;

L.      Hosting youth-focused parties across the United States, at which free JUUL samples were dispensed and in which vaping was featured prominently across JUUL-sponsored social media;

M.      Formulating JUULpods with flavors with the knowledge that such flavors appealed to youth and with the intent that youth become addicted or dependent upon JUUL products; and

N.      Promoting and assisting the growth of the JUUL market and its availability with knowledge that JUUL products were being purchased and used by large numbers of youth.

133.    The health and safety of the students and employees of Forest Hills School District, including those who use, have used, or will use JUUL products, as well as those affected by others' use of JUUL products, are matters of substantial public interest and of legitimate concern to the Plaintiff's students and employees, as well as to the entire Cambria County and Pennsylvania communities.

134.    Defendants' conduct was continuous and occurred over a span of years. Defendants' conduct has affected and continues to affect a substantial number of people within Forest Hills School District and is likely to continue causing significant harm.

135.    But for Defendants' actions, JUUL use by minors would not be as widespread as it is today, and the vaping public health epidemic that currently exists as a result of the Defendants' conduct would have been averted.

136.    Defendants' unfair and deceptive conduct has caused the damage and harm complained of herein. Defendants knew or reasonably should have known that their statements regarding the risks and benefits of JUUL were false and misleading, that their marketing methods were designed to appeal to minors, and that their false and misleading statements, marketing to

minors, and active efforts to increase the accessibility of JUUL products and grow JUUL's market share were causing harm to minors and to school districts, including minors in Forest Hills School District and the School District itself. Thus, the public nuisance caused by Defendants was reasonably foreseeable, including the financial and economic losses incurred by Forest Hills School District.

137.    Alternatively, Defendants' conduct was a substantial factor in bringing about the public nuisance even if a similar result would have occurred without it. By directly marketing to youth and continuing marketing practices after it was evidence that children were using JUUL products in large numbers and were specifically using these products in school, JUUL directly facilitated the spread of the youth vaping epidemic and the public nuisance affecting the School District. By investing billions of dollars in JUUL and actively working to promote the sale and spread of JUUL products with knowledge of JUUL practice of marketing its products to youth and failure to control youth access to its products, Altria directly facilitated the spread of the youth vaping epidemic and the public nuisance affecting Forest Hills School District.

138.    The public nuisance created and maintained by Defendants has resulted, and continues to result, in significant damage and annoyance to Plaintiff. Again, the FDA and others have recognized that teen vaping is an epidemic and that Defendants' actions are at the heart of that epidemic.

139.    The injury suffered by Plaintiff is distinguishable from that suffered by the general public, both in kind and quality. Plaintiff, a school district, has incurred, and continues to incur, significant expenditures of time and resources to combat rampant use of Defendants' nicotine products by students, including during school. The significant time and resources necessary to combat this reality and maintain the safety of Plaintiff's students and achieve the educational goals

of Plaintiff are unique from the hardships suffered by the general public.

## COUNT II – VIOLATION OF THE RACKETEER INFLUENCED
## CORRUPT ORGANIZATIONS ("RICO") ACT § 1962(a), (c), & (d)

140.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

141.     This claim is brought by Plaintiff against Defendants Monsees, Bowen, Pritzker, Huh, Valani, and Altria (the "RICO Defendants") for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, et seq.

142.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

143.     At all relevant times, each RICO Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

144.     Each RICO Defendant conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), as described herein.

145.     Plaintiff is a "person," as that term is defined in 18 U.S.C. § 1961(3), and has standing to sue under 18 U.S.C. § 1964(c) as it was and is injured in its business and/or property "by reason of" the RICO Act violations described herein.

146.     Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

> **a.     JLI is an Enterprise Engaged in, or its Activities Affect, Interstate or Foreign Commerce**

147.    Section 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

148.    JUUL Labs, Inc. ("JLI") is a corporation and therefore meets the definition of "enterprise" under the RICO Act. Specifically, JLI is registered as a corporate entity in the State of Delaware.

149.    Each of Defendants Pritzker, Huh, Valani, Bowen, and Monsees controlled the JLI Enterprise—that is, they used JLI as the vehicle through which an unlawful pattern of racketeering activity was committed—through their roles as officers and directors of JLI. As set forth below, their roles allowed them to control the resources and instrumentalities of JLI and use that control to perpetrate a number of fraudulent schemes involving the use of mail and wires, including sales to youth and fraudulently misrepresenting or omitting the truth about JUUL products to adult users and the public at large. For its part, Altria and Altria Client Services began conspiring with Defendants Pritzker and Valani to direct the affairs of JLI as early as Spring 2017, messaging that if JLI continued its massive growth—which they knew was achieved through youth marketing and fraudulent misrepresentations and omissions—they would receive a massive personal pay-off. The Altria Defendants started personally transmitting statements over the mail and wires in furtherance of the fraudulent schemes even before Altria's December 2018 investment in JLI. After that point, Altria gained even further influence over the JLI Board of Directors and installed its own personnel in key roles at JLI, cementing its direction of the Enterprise.

150.    JLI is an enterprise that is engaged in and affects interstate commerce because the company has sold and continues to sell products across the United States, as alleged herein.

151.   "[T]o conduct or participate, directly or indirectly, in the conduct" of an enterprise, "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

152.   As described herein, each RICO Defendant participated in the operation or management of the JLI Enterprise, and directed the affairs of the JLI Enterprise through a pattern of racketeering activity, including masterminding schemes to defraud that were carried out by and through JLI using the mail and wires in furtherance of plans that were designed with specific intent to defraud.

153.   Bowen and Monsees Founded the JLI Enterprise and Started its Mission of Hooking Kids and Lying to the Public and Regulators

154.   Plaintiff incorporates by reference, as if fully set forth herein, the factual allegations stated against Defendants Bowen and Monsees above.

155.   As described above in more detail, Defendants Bowen and Monsees were the visionaries behind JUUL, led JLI in its infancy to develop a highly addictive product, and formed JLI with the aim of creating a growing base of loyal users, including an illicit youth market of nicotine users, by following the same tactics that the cigarette industry has used for decades: selling to kids and lying to adults about their products. Together, Bowen and Monsees set out to "deliver solutions that refresh the magic and luxury of the tobacco category."[156]

156.   Monsees admitted that when creating JLI, he and Bowen carefully studied the marketing strategies, advertisements, and product design revealed in cigarette industry documents that were uncovered through litigation and made public under the November 1998 Master Settlement Agreement between the state Attorneys General of forty-six states, five U.S. territories,

---

[156] Josh Mings, *Ploom Model Two Slays Smoking With Slick Design and Heated Tobacco Pods*, SOLID SMACK (Apr. 23, 2014), www.solidsmack.com/ design/ploom-modeltwo-slick-design-tobacco-pods.

the District of Columbia, and the four largest cigarette manufacturers in the United States. "[Cigarette industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[157]

157.     Seizing on the decline in cigarette consumption and the lax regulatory environment for e-cigarettes, Bowen, Monsees, and investors in their company sought to introduce nicotine to a whole new generation of youth users, with JLI as the dominant supplier, by concealing the nicotine content and addictiveness of the products, and promoting these products to youth users. To achieve that goal, they knew they would need to create and market a product that would make nicotine cool to kids again, without the stigma associated with cigarettes, deceive the public about what they were doing, and prevent and delay regulation that would hinder their efforts to expand JUUL sales.

158.     Bowen led the design of the JUUL product, including by participating as a subject in many of the company's human studies. Bowen was instrumental in making the JUUL product appealing to youth, even though "he was aware early on of the risks e-cigarettes posed to teenagers." He drew on his experience as a design engineer at Apple to make JUUL resonate with Apple's popular aesthetics. This high-tech style made JUULs look "more like a cool gadget and less like a drug delivery device. This wasn't smoking or vaping, this was JUULing."[158] The evocation of technology makes JUUL familiar and desirable to the younger tech-savvy generation, particularly teenagers. According to a 19-year-old interviewed for the Vox series By Design, "our

---

[157] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, SOCIAL UNDERGROUND, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.
[158] *How JUUL Made Nicotine Go Viral*, VOX (Aug. 10, 2018), https://www.youtube.com/watch?v=AFOpoKBUyok.

grandmas have iPhones now, normal kids have JUULs now. Because it looks so modern, we kind of trust modern stuff a little bit more so we're like, we can use it, we're not going to have any trouble with it because you can trust it."[159]

159.    Bowen designed JUUL products to foster and sustain addiction, not break it. JLI and Bowen were the first to design an e-cigarette that could compete with combustible cigarettes on the speed and strength of nicotine delivery. Indeed, JUUL products use nicotine formulas and delivery methods much stronger than combustible cigarettes, confirming that what Bowen created an initiation product, not a cessation or cigarette replacement product. Bowen also innovated by making an e-cigarette that was smooth and easy to inhale, practically eliminating the harsh "throat hit," which otherwise deters nicotine consumption, especially among nicotine "learners," as R.J. Reynolds' chemist Claude Teague called new addicts, primarily young people.

160.    Bowen worked to minimize "throat hit" and maximize "buzz" of the JUUL e-cigarette. Dramatically reducing the throat hit is not necessary for a product that is aimed at smokers, who are accustomed to the harshness of cigarette smoke, but it very effectively appeals to nonsmokers, especially youth.

161.    The "buzz" testing results demonstrate that Bowen's goal was not to match the nicotine delivery profile of a cigarette, but to surpass it by designing a maximally addictive product, which could only be marketed as a cigarette substitute through a sophisticated fraud campaign.

162.    Bowen designed the JUUL product to deliver nicotine in larger amounts and at a faster rate than traditional cigarettes. This feature made the product more likely to capture users with the first hit.

---

[159] *Id.*

163.    Bowen was also heavily involved with JLI's marketing strategy, which primarily targeted youth users.

164.    Bowen personally developed JLI's strategy to market to youth and make JLI as profitable as possible, so that it would be an attractive investment for a major manufacturer of traditional cigarettes. In a 2016 e-mail exchange with JLI employees regarding potential partnerships with e-cigarette juice manufacturers, Bowen reminded the employees that "big tobacco is used to paying high multiples for brands and market share."[160] Bowen knew that to achieve the ultimate goal of acquisition, JLI would have to grow the market share of nicotine-addicted e-cigarette users, regardless of the human cost.

165.    Bowen's role in marketing included changing the name of "Crisp Mint" to "Cool Mint" in 2015. Bowen also oversaw JLI's formation of a commercial relationship with Avail Vapor, LLC, an Altria subsidiary, which Altria and JLI used to coordinate the flavor preservation schemes described below.

166.    Like Bowen, Monsees was instrumental to founding JLI with the aim of expanding the market of nicotine addicted e-cigarette users to include those "who aren't perfectly aligned with traditional tobacco products."[161]

167.    Monsees personally helped to market JLI to the "cool kids," using a sophisticated viral marketing campaign that strategically laced social media with false and misleading messages, to ensure their uptake and distribution among young users. Then, he subsequently and personally denied to the public and regulators that JLI had done just that.

168.    With help from their early investors and board members, who include Nicholas Pritzker, Hoyoung Huh, and Riaz Valani, Bowen and Monsees succeeded in hooking millions of

---

[160] INREJUUL_00294198.
[161] *Id.*

youth, intercepting millions of adults trying to overcome their nicotine addictions, delaying regulation that would have stopped their unlawful activities, and, of course, earning billions of dollars in profits.

> **b.    Pritzker, Huh, and Valani Exercised Control and Direction Over the JLI Enterprise**

169.    Plaintiff incorporates by reference, as if fully set forth herein, the factual allegations stated against Pritzker, Huh, and Valani above. As described above, Pritzker, Huh, and Valani were early investors in JLI who worked closely with Monsees and Bowen, and took control of the JLI Board of Directors in 2015.   Working in close collaboration with Monsees and Bowen, Pritzker, Huh, and Valani directed JLI's affairs and used the corporation to effectuate and continue fraudulent schemes for their own personal profits and financial benefits. Pritzker, Huh, and Valani were "more active than most" board members and, unlike most corporate board members, had active involvement in directing the company's actions week-to-week, including JLI's marketing efforts.

170.    Pritzker, Huh, and Valani exercised an intimate level of control over JLI during a key period—from October 2015 through at least May 2016—when the three Defendants (Pritzker, Huh, and Valani) served as the Executive Committee of the JLI Board of Directors.

171.    As detailed above, in 2015, there was a power struggle within JLI about whether to grow JLI's consumer base by targeting young people. Pritzker, Huh, and Valani favored aggressive marketing of JUUL products to young people. By October 2015, the power struggle was over, with the debate resolved in favor of selling to teens. At that time, Monsees stepped down as CEO to be replaced by the three-member "Executive Committee" comprised of Pritzker, Huh, and Valani. Huh served as the Executive Committee Chairman, and Pritzker served as Co-Chairman. The Executive Committee had the final say over all day-to-day operations of the JLI business. Huh, as

Chairman, and Pritzker, as Co-Chairman of JLI, were involved in the management of the company on a weekly basis. By December 2015, for example, the Executive Committee gave Pritzker and Huh supervisory responsibility for JLI employees. Valani, for his part, was also an active Board member, involved in the management of the company on a weekly basis. Dating back to 2011, Valani was a regular presence in JLI's offices, appearing in person at JLI's offices "a couple times a week."[162]

### c. Bowen, Monsees, Pritzker, Huh and Valani Exercised a Firm Grip over JLI

172.     By the summer of 2015, and at all times prior to Altria's investment in JLI, JLI was controlled by a Board of Directors with a maximum of seven seats. JLI co-founder Bowen has occupied a seat on JLI's Board from its inception. Likewise, Defendant Monsees was a member of the Board of Directors of JLI until he stepped down in March 2020. Defendant Pritzker has been on the Board of Directors of JLI since at least August 2013. He controlled two of JLI's seven maximum Board seats. Defendant Valani has been on JLI's Board of Directors since at least 2007. He also controlled two of JLI's maximum seven Board seats. Beginning around March 2015, Hank Handelsman occupied Valani's second seat. Notably, Handelsman has a close relationship with Pritzker, as he serves as general counsel for the Pritzker Organization. He also was a senior executive officer and general counsel for the Pritzker's Hyatt Corporation for several decades.

173.     Collectively, and prior to Altria's investment, Pritzker, Valani, Huh, Bowen, and Monsees controlled at least six of the seven seats on the JLI Board of Directors, which in turn allowed them to appoint the seventh member of the JLI Board of Directors. Thus, the Management Defendants had total control of the decisions of the Board of Directors. Pritzker and Valani, each

---

[162] https://www.vice.com/en/article/43kmwm/juul-founders-first-marketing-boss-told-us-the-vape-giants-strange-messy-origins

holding two Board seats (and thus a majority of the seven-seat Board), had the ability to control the outcome of all decisions of the Board of Directors, as Board decisions were decided by a majority vote. It also follows that, by controlling the majority of the JLI Board of Directors at all relevant times, Pritzker and Valani had an effective "veto" over any decisions made by the JLI Board of Directors. And, Pritzker, Huh, and Valani exercised even more close control during the time period in which they served on the Executive Committee.

174.    Through the Board of Directors' control over all aspects of JLI's business, Bowen, Monsees, Pritzker, Huh, and Valani used JLI as a vehicle to further fraudulent schemes of targeting youth, misrepresenting and omitting to users of all ages what JLI was really selling and to whom, and seeking to delay or prevent regulation that would impede the exponential growth of JUUL's massive youth market share. They achieved their ultimate goal of self-enrichment through fraud when Altria made an equity investment in JLI in December 2018.

**d.      In 2017, Altria Conspired with Pritzker and Valani to Influence and Indirectly Exercise Control Over JLI.**

175.    Plaintiff incorporates by reference, as if fully set forth herein, the factual allegations stated against the Altria Defendants above. As set forth above, Altria (through its subsidiary, Defendant Philip Morris) has been manufacturing and selling "combustible" cigarettes for more than a century, but, recognizing that regulation and litigation had resulted in declining cigarette sales, Altria was looking to enter the e-cigarette space. It formed a subsidiary, Nu Mark LLC, to develop and market an e-cigarette product, the Mark Ten. The Mark Ten was not a success, so Altria began eyeing an acquisition of the biggest player in the youth addiction game, JLI.

176.    Altria's pursuit led to eighteen months of negotiations with Altria and Altria Client Services on the one hand, and Defendants Pritzker and Valani on the other, regarding a potential acquisition or equity investment in JLI. They conspired to achieve the best outcome for Pritzker

and Valani personally, and for Altria as an entity. During these eighteen months, Altria, and Altria Client Services specifically, enticed Pritzker and Valani with a potential multi-billion-dollar payout. During that time, Pritzker, Valani, and the other Management Defendants committed numerous acts of fraud to grow the business of JLI to satisfy Altria's expectations. Meanwhile, Altria and Altria Client Services actively conspired with Pritzker and Valani to continue growing JLI's youth market by continuing JLI's fraudulent activities, their compliance ensured by that promised payout. Altria was gathering information on JLI to confirm Altria would be purchasing a company with a proven track record of sales to youths.

### e.    Altria Directly Exercises Control and Participates in of the JLI Enterprise

177.    By October 2018, Altria was directly transmitting statements over the mail and wires to support the JLI enterprise's efforts to fraudulently market JUUL products and to prevent or delay regulation.

178.    In December 2018, Altria publicly announced its ties to the JLI enterprise by making a $12.8 billion equity investment in JLI, the largest private equity investment in United States history. This investment led to massive personal financial benefit for each of the Management Defendants and gave Altria three seats on the JLI Board of Directors, allowing it to assert greater management and control over the JLI Enterprise, which used the instrumentalities of JLI to effectuate many of its fraudulent schemes.

179.    Following the investment, Altria also directly distributed fraudulent statements that JLI was a cessation device, that JLI did not target youth, and that the nicotine in a single JUUL pod was equivalent to a pack of cigarettes.

180.    Moreover, to further bolster its influence and control of JLI, Altria worked with Pritzker and Valani to install two key Altria executives into leadership positions at JLI: K.C.

Crosthwaite and Joe Murillo.

**The Fraudulent Schemes**

181.    As detailed above, the operation of the JLI Enterprise, as directed by the five individual Defendants and Altria, included several  schemes to defraud that helped to further the goals of the RICO Defendants—i.e., to expand the e-cigarette market, particularly among youth, for the five individual Defendants to reap huge personal profits, and for Altria to regain the market share that it was losing in the traditional cigarette arena and could no longer openly pursue through the same tactics used by JLI and the five individual Defendants.

**Fraudulent Marketing Scheme**

182.    As described above and in Sections IV.D, IV.E, JLI, and Defendants Bowen, Monsees, Pritzker, Huh, and Valani directed and caused JLI to make false and misleading advertisements that omitted references to JUUL's nicotine content and potency to be transmitted via the mail and wires, including the Vaporized campaign.

183.    As early as 2014, Pritzker participated in planning discussions with Monsees and Valani about how to expand JUUL's market share through marketing.

184.    In 2015, Bowen helped to finalize the messaging framework for JUUL's launch plan, including sponsored content on social media. This messaging was patently youth oriented and intentionally targeted children.

185.    Monsees studied the marketing techniques of the traditional cigarette industry, and he personally reviewed the photographs that were used in the youth-oriented advertisements that accompanied JUUL's launch. The "Vaporized" campaign featured bright colors and young models who were in "poses were often evocative of behaviors more characteristic of underage teen than

mature adults."[163]

186.     Monsees also provided specific direction as to the content of the JUUL website to JLI employees, and that content include false, misleading, and deceptive statements designed to induce users, and particularly young people, to purchase the JUUL product.

187.     Pritzker, Valani, Monsees, and Bowen—individually and collectively—approved images from the JUUL "Vaporized" ad campaign in 2015.  While they noted the youthfulness of the models, they expressed no concerns about the direction of the campaign, which was clearly directed to young users, they all supported launching the campaign—which then proved to be a great "success" in expanding vaping among underage users. And even though Pritzker, Huh, and Valani knew—and explicitly stated—that what they were doing was wrong, JLI pressed ahead with its youth-oriented marketing through early 2016.

188.     Before the launch of new JUUL advertising campaigns in 2015, Pritzker, Valani, and Bowen advised the JLI marketing team to allay their concerns about the messaging regarding the nicotine content of the JUUL product.

189.     Along with Valani, Pritzker was so directly involved in the "Vaporized" advertising campaign—which, as described above, marketed the JUUL product to teens—that JLI's COO in 2015 remarked that he was concerned that the Board would try to write copy for future branding changes.

190.     Huh was also instrumental in these early marketing campaigns, which were targeted to youth and omitted references to JUUL's nicotine content. In debates about whether to continue marketing JUUL aggressively to youth, Huh supported that action and asserted that the company

---

[163] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Robert K Jackler, Professor, Stanford University). https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

could not be blamed for youth nicotine addiction.

191.    During his stint as Executive Committee chairman, which lasted at least until May 2016, Huh approved specific branding changes in 2015 and 2016, as JLI developed and implemented its plans for marketing to youth.

192.    Various communications post-October 2015 demonstrate that Monsees deferred to Huh with regard to the direction of the company.

193.    Pritzker also personally controlled several aspects of JLI's branding. For instance, Pritzker was directly involved in creating JLI's corporate website in May 2017.  JLI used this website as another means to market its products to youth.

194.    Through the allegations above, Plaintiff has shown a direct connection between the RICO Defendants and this fraudulent scheme, including personal involvement in directing, in some part, the affairs of the JLI Enterprise.

**Youth Access Scheme**

195.    As described above and in Section IV.E, the five Management Defendants who controlled JLI acted individually and in concert to expand youth access to JUUL products through schemes to mislead customers about the products.

196.    As reflected in Section IV.E.11, JLI worked with Veratad to expand youth access while giving the appearance the JLI was combating youth access to its products.

197.    Through the allegations above, Plaintiff has shown a direct connection between the RICO Defendants and this fraudulent scheme, including personal involvement in directing, in some part, the affairs of the JLI Enterprise.

**Nicotine Content Misrepresentation Scheme**

198.    As described above and in Section IV.D, IV.G, the five Management Defendants

and Altria caused thousands, if not millions, of JUULpod packages to be distributed to users with false and misleading information regarding the JUUL pods' nicotine content. The five individual Defendants who controlled JLI also caused the same false and misleading information to be distributed via JLI's website.

199.    Defendant Bowen participated in studies regarding the nicotine content of JUUL pods, including by altering or re-engineering his own studies concerning nicotine content to mask the true content and impact in the products he developed.  He discussed his engineering test results (the Phase 1 results), and how they differed from the Phase 0 results, with Monsees, Pritzker and Valani.  He helped to select the 4% benzoate formulation that served as a model for all formulations used with the JUUL product. As formulated, JUUL pods were foreseeably exceptionally addictive, particularly when used by persons without prior exposure to nicotine.

200.    As alleged above, Defendants Monsees, Pritzker, and Valani had personal knowledge about JUUL product nicotine content through direct communications with Bowen discussing engineered test results (the Phase 1 results), and how they differed from the Phase 0 results.

201.    Defendants Bowen, Monsees, Pritzker and Valani thus caused the distribution of numerous JUUL pod packages, and statements on the JLI website and elsewhere, that fraudulently equated the nicotine content of one JUUL pod as equivalent to one pack of cigarettes. These statements were false, as a JUUL pod had substantially more nicotine than a standard pack of combustible cigarettes.

202.    Defendant Bowen also directed, on May 4, 2018, that Ashley Gould convey to the Washington Post that JLI's studies "support that nic strength and pack equivalence holds true," even though he knew this statement was false. On May 10, 2018, the Washington Post published

an article, quoting a JUUL spokesperson extensively and stating that JUUL "contains about the same amount of nicotine as a pack of cigarettes"—the exact false statement Bowen instructed Gould to convey to the Post.

203.    The following year, Monsees conveyed this same misinformation in deposition testimony in a proceeding before the United States International Trade Commission.

204.    Defendant Monsees also required, by no later than July 2018, that JLI employees obtain his personal approval for the artwork on all JUUL pod packaging.

205.    Several Altria Defendants were involved in this scheme as well. With the approval and consent of Altria Group and under the management of Altria Client Services (the "Provider Manager" for the contracts), Altria Group Distribution Company distributed millions of JUULpod packages to stores across the country. These packages included the false and misleading information regarding JUUL pods' nicotine content.

206.    Through the allegations above, Plaintiff has shown a direct connection between the RICO Defendants and this fraudulent scheme, including personal involvement in directing, in some part, the affairs of the JLI Enterprise.

**Flavor Preservation Scheme**

207.    As described above and in Section IV.I, the RICO Defendants worked in concert to defraud the public and deceive regulators to prevent regulation that would have impeded their plan to keep selling to children. Specifically, they worked to ensure that the FDA allowed JUUL's mint flavor to remain on the market.

208.    Altria and JLI had been working together on flavor strategy as early as September 2017, when Tyler Goldman and Gal Cohen (Valani's inside man within JLI) met with representatives of Altria Client Services to plan a strategy for responding to the FDA's proposed

regulation of flavors in e-cigarettes. This plan would be coordinated through Avail Vapor, LLC, a company partially owned by Altria. Through Avail, the RICO Defendants obtained evidence that confirmed that mint was so popular with non-smoking teenagers that even with mint as its sole flavor option, JLI would remain a multi-billion-dollar enterprise.

209.    Weeks before Altria's equity investment in December 2018, the regulatory pressure ramped up significantly, and Altria and JLI engaged in active fraud to lull the FDA that mint was simply a traditional cigarette flavor designed to help adult smokers switch, rather than a flavor that appealed primarily to youth. With the scheme in place, Altria and JLI finalized their deal.

210.    In September 25, 2018, then-FDA Commissioner Scott Gottlieb sent letters to Altria, JLI and other e-cigarette manufacturers, requesting a "detailed plan, including specific timeframes, to address and mitigate widespread use by minors."[164]

211.    Altria and JLI's responses to the FDA reflect a coordinated effort to mislead the FDA with the intention that regulators, in reliance on their statements, would allow JLI to continue marketing mint JUUL pods.[165]

212.    On October 25, 2018, Altria Group sent a letter to the FDA portraying mint as a traditional tobacco flavor. Altria shared this letter with Pritzker and Valani. JLI, at the direction of the five Management Defendants, subsequently sent a similar letter and false youth study, fraudulently claiming that mint was a traditional tobacco flavor and was not attractive to kids.

213.    Altria Group Distribution Company and Altria Group (through K.C. Crosthwaite) then distributed hundreds of thousands of mint pods in 2019. They focused on selling this flavor

---

[164] Letter from Scott Gottlieb, M.D. to JUUL Labs, Inc. (Sept. 12, 2018); Letter from Scott Gottlieb, M.D. to Altria Group Inc. (Sept. 12, 2018).
[165] *See United States v. Jones*, 712 F.2d 1316, 1320-21 (9th Cir. 1983) ("It is enough that the mails be used as part of a 'lulling' scheme by reassuring the victim that all is well and discouraging him from investigating and uncovering the fraud.").

in particular to take advantage of delayed regulation.

214.    Through the allegations above, Plaintiff has shown a direct connection between the RICO Defendants and this fraudulent scheme, including personal involvement in directing, in some part, the affairs of the JLI Enterprise.

**Cover-up Scheme**

215.    The RICO Defendants were not only concerned with protecting flavors, however. In light of growing public scrutiny of JLI's role in the youth vaping crisis, these Defendants continued their scheme to prevent a complete ban on JLI's product by portraying JUUL as a smoking cessation device and denying that the company ever marketed to youth.

216.    As described above and in Sections IV.D, IV.E, JLI maintained website pages that provided false information about the addictive potential of its products and denied that JLI marketed to youth. Defendants Bowen, Monsees, Pritzker, Huh, and Valani directed the content of the JLI website and had "final say" over JLI's marketing messaging.

217.    Bowen understood that children were using the JUUL product and intentionally continued the youth-appealing marketing strategy. For instance, in 2016, upon seeing social media posts of teenagers using JUUL products, he remarked that he was "astounded by this 'ad campaign' that apparently some rich east coast boarding school kids are putting on," and he added that Valani was plotting how JUUL could "leverage user generated content" to increase sales.

218.    Monsees knew before the JUUL launch that JUUL would be attractive to youth. In October 2014, Monsees received results from a JUUL prototype, including comments that while JUUL was "too much" for smokers, the "younger group" liked JUUL, and JUUL "might manage to make smoking cool again." Monsees saw this information as an opportunity, not as a warning.

219.    Bowen and Monsees were well aware that JUUL branding was oriented toward

teens, and they mimicked the previous efforts of the tobacco industry to hook children on nicotine, to increase JUUL sales.

220.    In 2015, JLI's Board—controlled by Bowen, Monsees, Pritzker, Huh, and Valani—met frequently, and the appeal of JUUL to underage users was a constant topic of discussion, as detailed above.  Individually and collectively, Pritzker, Huh, and Valani affirmed this course of action, taking steps to continue marketing efforts to youth and rejecting efforts by other Board members to curtail them.

221.    Also in 2018, when concern grew about youth vaping, Valani directed JLI's strategy in responding to such concerns.  As directed by Valani, the goal was to debunk studies linking the company with the youth vaping crisis and to try to focus attention on youth smokers who allegedly had switched to JUUL—a misinformation campaign designed to stave off regulation or the ban of JUUL products.

222.    Likewise, in 2018, Pritzker and Valani were heavily involved in planning sham "youth prevention" activities, whereby JLI would put on seminars for school children that ostensibly were designed to prevent youth vaping, but which actually told school children that vaping was safe and even taught children how to use the product.

223.    Pritzker was heavily involved in JLI's public relations activities, including granular detail such as directing responses to particular inquiries from teachers. Along with Valani, Pritzker also approved a press release in response to an inquiry by U.S. Senators, falsely detailing JLI's alleged youth vaping prevention efforts.

224.    Pritzker and Valani each edited and revised press releases about JLI's youth prevention activities and steps it claimed to be taking to prevent youth sales, and they approved CEO Kevin Burn's op-ed to the Washington Post claiming that the company did not want to sell

to youth and was only targeting adult smokers.

225.    The five individual Defendants caused false and misleading advertising to be distributed over television and the internet, to give the impression that JLI's product was a smoking cessation device and that JLI never marketed to youth.

226.    Valani and Pritzker routinely approved the copy for JUUL advertising spots. For example, Kevin Burns sought Pritzker and Valani's approval of the fraudulent "*Make the Switch*" advertising campaign, which was distributed over the mail and wires.

227.    The *Make the Switch* campaign featured former smokers aged 37 to 54 discussing how JUUL helped them quit smoking. According to JLI's Vice President of Marketing, the "*Make the Switch*" campaign was "an honest, straight down the middle of the fairway, very clear communication about what we're trying to do as a company." But these statements were false, as JUUL was not intended to be a smoking cessation device.

228.    Defendant Altria Group's subsidiaries Philip Morris USA and AGDC continued this scheme by transmitting the fraudulent *"Make the Switch"* advertisements in packs of its combustible cigarettes.  These advertisements falsely portrayed the JUUL product as a smoking cessation device for adults. Defendant Altria Client Services did the same by e-mailing and mailing out hundreds of thousands of "Make the Switch" advertisements, with the approval and consent of Altria Group.

229.    Monsees perpetuated the myth that JUUL was designed as a smoking cessation device, even though it was designed to appeal to young nonsmokers. Monsees testified before congress that JUUL was an "alternative" to traditional "cessation products" that "have extremely low efficacy."

230.    In response to a direct question about whether people buy JUUL to stop smoking,

Defendant Monsees responded: "Yes. I would say nearly everyone uses our product as an alternative to traditional tobacco products."[166]

231.    These statements were false, and Monsees knew that they were false, as JUUL was not intended as a smoking cessation device.

232.    Monsees also committed mail or wire fraud by giving the following written testimony to Congress, which was false: "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. ... That is a serious problem. Our company has no higher priority than combatting underage use."

233.    Monsees further committed mail or wire fraud with a false statement, through JLI's website, that: "We have no higher priority than to prevent youth usage of our products which is why we have taken aggressive, industry leading actions to combat youth usage." In reality, the RICO Defendants, through JLI, knowingly and intentionally marketed its product to youth users.

234.    Beginning in October 2018, both Altria and JLI transmitted false and misleading communications to the public and the federal government, including Congress and the FDA, in an attempt to stave off regulation of the JUUL product.

235.    As detailed above, each RICO Defendant directed and participated in these fraudulent schemes, either directly or indirectly, with specific intent to defraud, and used JLI as a vehicle to carry out this pattern of racketeering activity.

f.    "Pattern of Racketeering Activity"

236.    The RICO Defendants did willfully or knowingly conduct or participate in, directly or indirectly, the affairs of the Enterprise through a pattern of racketeering activity within the

---

[166] *Id.*

meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

237.    Specifically, the RICO Defendants—individually and collectively—have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years, as described herein.

238.    The multiple acts of racketeering activity that the RICO Defendants committed, or aided or abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

239.    The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of the Enterprise's objectives through common misrepresentations, concealments, and material omissions.

240.    As described above, the RICO Defendants devised and knowingly carried out material schemes and/or artifices to defraud the public and  deceive regulators by (1) transmitting advertisements that fraudulently and deceptively omitted any reference to JUUL's nicotine content or potency (or any meaningful reference, where one was made); (2) causing false and misleading statements regarding the nicotine content of JUUL pods to be posted on the JLI website; (3) causing thousands, if not millions, of JUUL pod packages containing false and misleading statements regarding the nicotine content of JUUL pods to be transmitted via U.S. mail; (4) representing to users and the public at-large that JUUL was created and designed as a smoking cessation device; (5) misrepresenting the nicotine content and addictive potential of its products; (6) making fraudulent statements to the FDA to persuade the FDA to allow mint flavored JUUL pods to remain on the market; and (7) making fraudulent statements to the public (including

through advertising), the FDA, and Congress to prevent prohibition of JUUL cigarettes, as was being contemplated in light of JLI's role in the youth vaping epidemic.

241.    The RICO Defendants committed these racketeering acts intentionally and knowingly, with the specific intent to defraud and to personally or directly profit from these actions.

242.    The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

    A.    Mail Fraud: the Enterprise violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, fraudulent materials via U.S. mail or commercial interstate carriers for the purpose of deceiving the public, regulators, and Congress.

    B.    Wire Fraud: the Enterprise violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, fraudulent materials by wire for the purpose of deceiving the public, regulators, and Congress.

243.    As explained above, the RICO Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity by falsely and misleadingly using the mails and wires in violation of 18 U.S.C. § 1341 and § 1343.  To the extent that JLI itself or a JLI officer other than one or more of the RICO Defendants made a particular statement listed below, the five individual Defendants who controlled JLI and Altria caused those statements to be made through their control of JLI and through their control of the communications that JLI was disseminating to the FDA, to Congress, and to the general public in connection with directing the affairs of JLI.  As detailed above, these statements are alleged to be part of the fraudulent schemes masterminded by the RICO Defendants who conducted the affairs of JLI.

244.    Illustrative and non-exhaustive examples include the following:

| From | To | Date | Description |
|------|-----|------|-------------|
| *Statements Omitting Reference to JUUL's Nicotine Content (see Section IV.E)* | | | |
| JLI | Public (via television, internet, and mail) | 2015 | "Vaporized" Campaign, and other advertising campaigns transmitted via the mails and wires which targeted under-age vapers and omitted any reference to JUUL's nicotine content. |
| JLI | Members of the public on JLI's email distribution list | June 2015 to April 7, 2016 | 171 promotional emails were sent to members of the public with no mention of JUUL nicotine content. For example, on July 11, 2015, JLI, following the marketing plan directed and approved by the Management Defendants, sent an email via the wires in interstate commerce from JUUL's email address to people who had signed up from JUUL emails, including youth. This email advertised JUUL's promotion events and said "Music, Art, & JUUL. What could be better? Stop by and be gifted a free starter kit." This email did not mention that JUUL contained nicotine nor that JUUL or the free starter kits were only for adults. |

| JLI | Public (via internet – Twitter) | June 2015 to October 6, 2017 | JLI's Twitter feed, @JUULvapor, and its 2,691 tweets, did not contain a nicotine warning.  For example, on August 7, 2015, the @JUULvapor Twitter account published a tweet advertising the Cinespia "Movies All Night Slumber Party" and captioned it "Need tix for @cinespia 8/15? We got you. Follow us and tweet #JUULallnight and our faves will get a pair of tix!"  This tweet was delivered via the wires in interstate commerce to members of the public, including followers of JLI's Twitter Feed, which included youth. This tweet did not mention that JUUL contained nicotine. |
| --- | --- | --- | --- |
| JLI | Public (via internet – Twitter) | July 28, 2017 | The @JUULvapor Twitter account published a tweet, showing an image of a Mango JUULpod next to mangos, and captioned "#ICYMI: Mango is now in Auto-ship! Get the #JUULpod flavor you love delivered & save 15%. Sign up today."  This tweet was delivered via the wires in interstate commerce to members of the public, including followers of JLI's Twitter Feed, which included youth. This tweet did not mention that JUUL contained nicotine. |
| JLI | Public (via internet – Twitter) | August 4, 2017 | The @JUULvapor Twitter account published a tweet promoting Mint JUULpods with an image stating "Beat The August Heat with Cool Mint" and "Crisp peppermint flavor with a pleasant aftertaste," captioned "A new month means you can stock up on as many as 15 #JUULpod packs. Shop now."  This tweet was delivered via the wires in interstate commerce to members of the public, including followers of JLI's Twitter Feed, which included youth. This tweet did not mention that JUUL contained nicotine. |

| JLI | Public (via internet – Twitter) | August 28, 2017 | The @JUULvapor Twitter account published a tweet comparing JUULpods to dessert with an image and stating "Do you bruleé? RT if you enjoy dessert without a spoon with our Crème Brulee #JUULpods." This tweet was delivered via the wires in interstate commerce to members of the public, including followers of JLI's Twitter Feed, which included youth. This tweet did not mention that JUUL contained nicotine. |
|---|---|---|---|
| **Statements that JUUL is a Cessation Device (see Section IV.D.4)** | | | |
| JLI | Public (via internet – Twitter) | July 5, 2017 | The @JUULvapor Twitter account published a tweet stating "Here at JUUL we are focused on driving innovation to eliminate cigarettes, with the corporate goal of improving the lives of the world's one billion adult smokers." |
| JLI | Public (via internet – JLI Website) | April 25, 2018 (or earlier) to Present | "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by eliminating cigarettes. We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire." |
| Kevin Burns (former JLI CEO) | Public (via internet – JLI Website) | November 13, 2018 | "To paraphrase Commissioner Gottlieb, we want to be the offramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." |
| JLI | Public (via internet – JLI Website) | September 19, 2019 | "JUUL Labs, which exists to help adult smokers switch off of combustible cigarettes." |

| Howard Willard (Altria CEO) | Public (via internet – Altria website) | December 20, 2018 | "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers. ... We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." |
|---|---|---|---|
| Howard Willard | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | "We believe e-vapor products present an important opportunity to adult smokers to switch from combustible cigarettes." |
| ***Statements Regarding Nicotine Content in JUUL pods (see Section IV.D)*** | | | |
| JLI | Public (via internet – JLI website) | July 2, 2019 (or earlier) to Present | "Each 5% JUUL pod is roughly equivalent to one pack of cigarettes in nicotine delivery." |
| JLI | Public (via internet – JLI website) | April 21, 2017 | "JUUL pod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs." |
| JLI; AGDC; Altria Client Services | Public (via U.S. mail distribution of JUUL pod packaging) | 2015 to Present | JUUL pod packages (1) claiming a 5% nicotine strength; (2) stating that a JUUL pod is "approximately equivalent to about 1 pack of cigarettes." |
| ***Statements to Prevent Regulation of Mint Flavor (see Sections IV.C.6 and IV.I.2)*** | | | |

| JLI | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA)<br><br>November 12, 2018 (Public) | JLI's Action Plan that fraudulently characterizes mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers. |
| --- | --- | --- | --- |
| Howard Willard (Altria Group CEO) | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | Letter from H. Willard to FDA fraudulently representing mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers. |
| JLI | FDA (via U.S. mail or electronic transmission) | November 5, 2018 | Fraudulent youth prevalence study transmitted by JLI to the FDA. |
| **_Statements to Prevent Ban on JUUL Products or Overwhelming Public Outcry (see Sections IV.D.4 and IV.E.14)_** | | | |
| JLI | Public (via Television) | January 2019 | $10 million "Make the Switch" advertising campaign, which was designed to deceive the public and regulators into believing that JLI was only targeting adult smokers with its advertising and product, and that JUUL was a smoking cessation product. |
| AGDC; Philip Morris; JLI | Public (via inserts in combustible cigarette packs) | December 2018 - Present | "Make the Switch" advertising campaign, for the purpose of deceiving smokers into believing that JUUL was a cessation product. |
| Altria Client Services; JLI | Public (via direct mail and email campaigns) | December 2018 – Present | "Make the Switch" advertising campaign, for the purpose of deceiving smokers into believing that JUUL was a cessation product. |

| JLI Chief Administrative Officer | Public (via interview with CNBC, later posted on internet) | December 14, 2017 | "It's a really, really important issue. We don't want kids using our products." |
|---|---|---|---|
| JLI | Public (via internet - social media) | March 14, 2018 | "We market our products responsibly, following strict guidelines to have material directly exclusively toward adult smokers and never to youth audiences." |
| JLI | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA)<br><br>November 12, 2018 (Public) | "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. ... Our intent was never to have youth use JUUL products." |
| Then-CEO of JLI (Kevin Burns) | Public (via interview with CNBC – later posted on internet) | July 13, 2019 | "First of all, I'd tell them that I'm sorry that their child's using the product. It's not intended for them. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." |
| JLI | Public (via internet - JLI website) | August 29, 2019 | "We have no higher priority than to prevent youth usage of our products which is why we have taken aggressive, industry leading actions to combat youth usage." |
| James Monsees | Public (via statement to New York Times – later posted on internet) | August 27, 2019 | Monsees said selling JUUL products to youth was "antithetical to the company's mission." |

| JLI | Public (via statement to Los Angeles Times – later posted on internet) | September 24, 2019 | "We have never marketed to youth and we never will." |
|---|---|---|---|
| JLI (via counsel) | FDA (via U.S. mail or electronic transmission to Dr. Matthew Holman) | June 15, 2018 | Letter from JLI's Counsel at Sidley Austin to Dr. Matthew Holman, FDA, stating: "JUUL was not designed for youth, nor has any marketing or research effort since the product's inception been targeted to youth." and "With this response, the Company hopes FDA comes to appreciate why the product was developed and how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers." |
| James Monsees | Congress (via U.S. mail or electronic transmission of written testimony) | July 25, 2019 | Written Testimony of J. Monsees provided to Congress, stating: "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. ... That is a serious problem. Our company has no higher priority than combatting underage use." |
| Howard Willard | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | "[W]e do not believe we have a current issue with youth access to or use of our pod-based products, we do not want to risk contributing to the issue." |

| Howard Willard | Congress (via U.S. mail or electronic transmission of letter to Senator Durbin) | October 14, 2019 | "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers. We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products." |
| JLI | Public (via Pam Tighe at CBS News) | October 17, 2016 | "Our Marketing Efforts are Adult-targeted. . . Any media is focused on 21+ adult smokers and we always adhere to or exceed all tobacco guidelines for advertising in home, radio and digital." |
| Kevin Burns, then-CEO of JLI | Public (via JLI's website) | April 25, 2018 | "Our company's mission is to eliminate cigarettes and help the more than one billion smokers worldwide switch to a better alternative . . . . We are already seeing success in our efforts to enable adult smokers to transition away from cigarettes and believe our products have the potential over the long-term to contribute meaningfully to public health in the U.S. and around the world. At the same time, we are committed to deterring young people, as well as adults who do not currently smoke, from using our products. We cannot be more emphatic on this point: No young person or non-nicotine user should ever try JUUL." |

| Ashely Gould, JLI Chief Administrative Officer | Public (via JLI's website) | April 25, 2018 | "Our objective is to provide the 38 million American adult smokers with meaningful alternatives to cigarettes while also ensuring that individuals who are not already smokers, particularly young people, are not attracted to nicotine products such as JUUL . . . . We want to be a leader in seeking solutions, and are actively engaged with, and listening to, community leaders, educators and lawmakers on how best to effectively keep young people away from JUUL." |
|---|---|---|---|
| JLI | Public (via JLI's website) | July 24, 2018 | "We welcome the opportunity to work with the Massachusetts Attorney General because, we too, are committed to preventing underage use of JUUL. We utilize stringent online tools to block attempts by those under the age of 21 from purchasing our products, including unique ID match and age verification technology. Furthermore, we have never marketed to anyone underage. Like many Silicon Valley technology startups, our growth is not the result of marketing but rather a superior product disrupting an archaic industry. When adult smokers find an effective alternative to cigarettes, they tell other adult smokers. That's how we've gained 70% of the market share. . . . Our ecommerce platform utilizes unique ID match and age verification technology to make sure minors are not able to access and purchase our products online." |

| JLI | Public (via JLI's website) | July 26, 2018 | "We did not create JUUL to undermine years of effective tobacco control, and we do not want to see a new generation of smokers. . . . We want to be part of the solution to end combustible smoking, not part of a problem to attract youth, never smokers, or former smokers to nicotine products. . . .We adhere to strict guidelines to ensure that our marketing is directed towards existing adult smokers." |
|---|---|---|---|
| Adam Bowen | Public (via statement to New York Times – later posted on internet) | August 27, 2018 | Bowen said he was aware early on of the risks e-cigarettes posed to teenagers, and the company had tried to make the gadgets "as adult-oriented as possible," purposely choosing not to use cartoon characters or candy names for its flavors. |
| James Monsees | Public (via statement to *Forbes*, later published on internet) | November 16, 2018 | "Any underage consumers using this product are absolutely a negative for our business. We don't want them. We will never market to them. We never have." |
| Altria Group | Public (via internet) | December 20, 2018 | Statement published in Altria news release stating: "Altria and JUUL are committed to preventing kids from using any tobacco products. As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve. As JUUL previously said, 'Our intent was never to have youth use JUUL products.'" |
| Altria Group | Public (via Earnings Call) | January 31, 2019 | "Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor category but to also support and even accelerate transition to noncombustible alternative products by adult smokers." |

| K.C. Crosthwaite, JLI's CEO | Public (via JLI's website) | September 25, 2019 | "I have long believed in a future where adult smokers overwhelmingly choose alternative products like JUUL. That has been this company's mission since it was founded, and it has taken great strides in that direction." |
|---|---|---|---|
| JLI | Public (via JLI's website) | March 29, 2020 | "JUUL was designed with adult smokers in mind." |

245.     The mail and wire transmissions described herein were made in furtherance of the RICO Defendants' schemes and common course of conduct, thereby increasing or maintaining JLI's market share. The sections cross-referenced in the chart detail how the RICO Defendants caused such mailings or transmissions to be made. As described in those detailed factual allegations, the RICO Defendants did so either by directly approving certain fraudulent statements or by setting in motion a scheme to defraud that would reasonably lead to such fraudulent statements being transmitted via the mail and wires.

246.     As described above, the RICO Defendants used JLI to further schemes to defraud the public and deceive regulators, to continue selling nicotine products to youth, and to protect their market share by denying that JLI marketed to youth and claiming that JUUL was created and designed as a smoking cessation device (or a mitigated risk product).

247.     The RICO Defendants used these mail and wire transmissions, directly or indirectly, in furtherance of this scheme by transmitting deliberately false and misleading statements to the public and to government regulators.

248.     The RICO Defendants had a specific intent to deceive regulators and defraud the public. For example, as alleged above, JLI made repeated and unequivocal statements through the wires and mails that it was not marketing to children and that its products were designed for adult smokers. These statements were false. Each of the RICO Defendants knew these statements were

false but caused these statements to be made anyway. Similarly, the RICO Defendants caused to be transmitted through the wires and mails false and misleading statements regarding the nicotine content in JUUL pods, which JLI's own internal data, and Altria's own pharmacokinetic studies, showed were false. Moreover, each of the Enterprise Defendants had direct involvement in marketing statements by JLI and thus caused such statements to be made, notwithstanding that they knew they were false for the reasons detailed above.

249.    The RICO Defendants intended the public and regulators to rely on these false transmissions, and this scheme was therefore reasonably calculated to deceive persons of ordinary prudence and comprehension.

250.    The public and government regulators relied on the Enterprise's mail and wire fraud. For example, the regulators, including the FDA, relied on the Enterprise's statements that mint was not an appealing flavor for nonsmokers in allowing mint JUUL pods to remain on the market. Regulators also relied on the Enterprise's statements that it did not market to youth in allowing the RICO Defendants to continue marketing and selling JUUL. Congress likewise relied on the Enterprise's statements in not bringing legislation to recall or ban e-cigarettes, despite the calls of members of both parties to do just that. And, the public relied on statements (or the absence thereof) that were transmitted by the RICO Defendants regarding the nicotine content in and potency of JUUL pods in deciding to purchase JUUL products.

251.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the RICO Defendants' books and records. Plaintiff has, however, described the types of predicate acts of mail and/or wire fraud, including the specific types of fraudulent statements upon which, through

the mail and wires, the RICO Defendants engaged in fraudulent activity in furtherance of their overlapping schemes.

252.    These were not isolated incidents. Instead, the RICO Defendants engaged in a pattern of racketeering activity by committing thousands of related predicate acts in a five-year period, in the form of mail and wire fraud, and there remains a threat that such conduct will continue or recur in the future. That each RICO Defendant participated in a variety of schemes involving thousands of predicate acts of mail and wire fraud establishes that such fraudulent acts are part of the Enterprise's regular way of doing business. Moreover, Plaintiff expects to uncover even more coordinated, predicate acts of fraud as discovery in this case continues.

       g.     **Plaintiff Has Been Damaged by the Enterprise Defendants' RICO Violations**

253.    Plaintiff has been injured by the Enterprise Defendants' conduct, and such injury would not have occurred but for the predicate acts of those defendants which also constitute the acts taken by the RICO Defendants in furtherance of their conspiracy pursuant to Section 1962(d). By working to preserve and expand the market of underage JUUL customers, fraudulently denying JLI's youth-focused marketing, and deceiving regulators and the public in order to allow JUUL products and mint-flavored JUULpods to remain on the market, the Enterprise caused the expansion of an illicit e-cigarette market for youth in Plaintiff's schools and caused a large number of youth in Plaintiff's schools to become addicted to nicotine, thus forcing Plaintiff to expend time, money, and resources to address the epidemic Defendants created through their conduct. Indeed, the Enterprise Defendants intentionally sought to reach into schools and deceive public health officials in order to continue growing JLI's youth customer base. The repeated fraudulent misstatements by the Enterprise Defendants denying that JLI marketed to youth have served to

preserve JUUL's market share—a market share that is based upon children purchasing JLI's tobacco products.

254.    Plaintiff was a direct victim of Defendants' misconduct. The Enterprise Defendants displayed a wanton disregard for public health and safety by intentionally addicting youth, including youth in Plaintiff's schools, to nicotine and then attempting to cover up their scheme in order to maintain and expand JUUL's market share. Defendants actively concealed that they marketed to youth in order to avoid public condemnation and to keep their products on the market and continue youth sales. This forced Plaintiff to shoulder the responsibility for this youth e-cigarette crisis created by Defendants' misconduct. The harm from the illicit youth e-cigarette market created by Defendants required Plaintiff to expend its limited financial and other resources to mitigate the health crisis of youth e-cigarette use. The expansion of this youth e-cigarette market was the goal of the Enterprise and is critical to its success. Therefore, the harm suffered by Plaintiff because it must address and mitigate the youth e-cigarette crisis was directly foreseeable and, in fact, an intentional result of Defendants' misconduct.

255.    The creation and maintenance of this youth e-cigarette market directly harms Plaintiff by imposing costs on its business and property. Plaintiff's injuries were not solely the result of routine government expenses. Instead, as a result of Defendants' misconduct, Plaintiff has been and will be forced to go far beyond what a governmental entity might ordinarily be expected to pay to enforce the laws and to promote the general welfare in order to combat the youth e-cigarette crisis. This includes providing new programs and new services as a direct result and in direct response to Defendants' misconduct. As a result of the conduct of the Enterprise Defendants, Plaintiff has incurred and will incur costs that far exceed the norm.

256.     There are no intervening acts or parties that could interrupt the causal chain between the Defendants' mail and wire fraud and Plaintiff's injuries. Defendants, in furtherance of the Enterprise's common purpose, made false and misleading statements directly to the public, including Plaintiff, its employees, and its students. And in the case of fraud on third parties (i.e., FDA and Congress), causation is not defeated merely because the RICO Defendants deceived a third party into not taking action where the FDA's and Congress's failure to regulate directly allowed youth in Plaintiff's schools to purchase products that should not have been on the market and/or that should not have been marketed to minors.

257.     As to predicate acts occurring prior to May 8, 2016, Plaintiff did not discover, and could not have been aware despite the exercise of reasonable diligence, until shortly before the initiation of the instant litigation that Defendants transmitted fraudulent statements via the mails and wires regarding the topics described above including, inter alia, the true nicotine content in and delivered by JUUL products, such information the Defendants concealed and failed to truthfully disclose.

258.     The Enterprise's violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiff, its community, and the public, and Plaintiff is entitled to bring this action for three times its actual damages, as well as for injunctive/equitable relief, costs, and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

   **2.     Violations of 18 U.S.C. § 1962(d)**

259.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

260.     Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

261.    The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants agreed to facilitate the operation of the Enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c), as described herein. The conspiracy is coterminous with the time period in which the Enterprise has existed, beginning before JLI was officially formed in 2015 and continuing to this day (with Defendant Altria joining the conspiracy by at least Spring 2017).

262.    The RICO Defendants' agreement is evidenced by their predicate acts and direct participation in the control and operation of the Enterprise, as detailed above in relation to the RICO Defendants' substantive violation of Section 1962(c). In particular, as described above, Altria's agreement is shown by the fact that it was well aware of JLI's fraudulent activities in marketing its products to youth but claiming that it would not do so, yet Altria nonetheless secretly collaborated with JLI to continue those unlawful activities, and it eventually made a multi-billion dollar investment in JLI and continued the deception by directing the affairs of JLI.

263.    The acts in furtherance of the conspiracy attributable to the RICO Defendants include each of the predicate acts underlying the RICO Defendants' use of the JLI Enterprise to, directly or indirectly, engage in a pattern of racketeering activity in violation of Section 1962(c), as described above. Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants in this Complaint, have participated as co-conspirators with the members of the Enterprise in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenue, maintain or increase market share, and/or minimize losses for the Defendants and their named and unnamed co-conspirators throughout the illegal

scheme and common course of conduct. Where a RICO Defendant did not commit a predicate act itself, it agreed to the commission of the predicate act.

264.    Plaintiff has been injured by the RICO Defendants' conduct, and such injury would not have occurred but for the predicate acts of those defendants which also constitute the acts taken by the RICO Defendants in furtherance of their conspiracy pursuant to Section 1962(d). The combined effect of the RICO Defendants' acts of mail and wire fraud in furtherance of their conspiracy, including working to preserve and expand the market of underage JUUL customers, fraudulently denying JLI's youth-focused marketing, and deceiving regulators and the public in order to allow JUUL products and mint-flavored JUUL pods to remain on the market, was to cause e caused the expansion of an illicit e-cigarette market for youth in Plaintiff's schools and cause a large number of youth in Plaintiff's schools to become addicted to nicotine, thus forcing Plaintiff to expend time, money, and resources to address the epidemic Defendants created through their conduct. Indeed, the Enterprise Defendants intentionally sought to reach into schools and deceive public health officials in order to continue growing JLI's youth customer base. The repeated fraudulent misstatements by the Enterprise Defendants denying that JLI marketed to youth have served to preserve JUUL's market share—a market share that is based upon children purchasing JLI's tobacco products. The harm to Plaintiff would not have occurred absent the RICO Defendants' conspiracy to engage in a pattern of racketeering activity through a RICO Enterprise, the common purpose of which was maintaining and expanding the number of nicotine-addicted e-cigarette users, and youth in particular, in order to ensure a steady and growing customer base, including by preserving and growing JLI's ill-gotten market share.

265.    Plaintiff was a direct victim of Defendants' misconduct. The Enterprise Defendants' acts in furtherance of their RICO conspiracy displayed a wanton disregard for public

health and safety by intentionally addicting youth, including youth in Plaintiff's schools, to nicotine and then attempting to cover up their scheme in order to maintain and expand JUUL's market share. Defendants actively concealed that they marketed to youth in order to avoid public condemnation and to keep their products on the market and continue youth sales. This forced Plaintiff to shoulder the responsibility for this youth e-cigarette crisis created by Defendants' misconduct. The harm from the illicit youth e-cigarette market created by Defendants required Plaintiff to expend its limited financial and other resources to mitigate the health crisis of youth e-cigarette. The expansion of this youth e-cigarette market was the goal of the Enterprise and is critical to its success. Therefore, the harm suffered by Plaintiff because it must address and mitigate the youth e-cigarette crisis was directly foreseeable and, in fact, an intentional result of Defendants' misconduct.

266.     The creation and maintenance of this youth e-cigarette market, and Defendants actions in furtherance of their RICO conspiracy, directly harms Plaintiff by imposing costs on its business and property. Plaintiff's injuries were not solely the result of routine government expenses. Instead, as a result of Defendants' misconduct, Plaintiff has been and will be forced to go far beyond what a governmental entity might ordinarily be expected to pay to enforce the laws and to promote the general welfare in order to combat the youth e-cigarette crisis. This includes providing new programs and new services as a direct result and in direct response to Defendants' misconduct. As a result of the conduct of the Enterprise Defendants, Plaintiff has incurred and will incur costs that far exceed the norm.

267.     There are no intervening acts or parties that could interrupt the causal chain between the RICO Defendants' mail and wire fraud acts in furtherance of their RICO conspiracy and Plaintiff's injuries. The RICO Defendants, in furtherance of their conspiracy to form the Enterprise

and advance its common purpose, made false and misleading statements directly to the public, including Plaintiff, its employees, and its students. And in the case of fraud on third parties (i.e., FDA and Congress), causation is not defeated merely because the RICO Defendants deceived a third party into not taking action where the FDA's and Congress's failure to regulate directly allowed youth in Plaintiff's schools to purchase products that should not have been on the market and/or that should not have been marketed to minors.

268.     As to predicate acts undertaken in furtherance of the conspiracy which occurred prior to May 8, 2016, Plaintiff did not discover, and could not have been aware despite the exercise of reasonable diligence, until shortly before the initiation of the instant litigation that the RICO Defendants transmitted fraudulent statements via the mails and wires regarding the topics described above including, inter alia, the true nicotine content in and delivered by JUUL products, such information the RICO Defendants concealed and failed to truthfully disclose.

269.     The Enterprise's violations of 18 U.S.C. § 1962(d) have directly and proximately caused injuries and damages to Plaintiff, its community, and the public, and Plaintiff is entitled to bring this action for three times its actual damages, as well as for injunctive/equitable relief, costs, and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**COUNT III – NEGLIGENCE**

270.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

271.     Defendants owed Plaintiff a duty to not expose Plaintiff to an unreasonable risk of harm.

272.     At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply promotion, packaging,

sale, and distribution of its JUUL products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

273.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of its JUUL products. Defendants' duty of care owed to consumers and the general public, including Plaintiff, included providing accurate, true, and correct information concerning the risks of using JUUL products and appropriate, complete, and accurate warnings concerning the potential adverse effects of vaping and nicotine use and, in particular, JUUL's patented nicotine salts and the chemical makeup of JUULpods liquids.

274.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of JUUL products and specifically, the health hazards posed by vaping JUULpods and continued use of nicotine, particularly among adolescents.

275.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of JUUL e-cigarettes and JUULpods by students could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to Plaintiff.

276.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of JUUL products were unaware of the risks and the magnitude of the risks associated with the use of JUUL products, including but not limited to the risk of continued nicotine use and nicotine addiction.

277.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply,

promotion, advertisement, packaging, sale, and distribution of its JUUL e-cigarettes and JUULpods, in that Defendants manufactured and produced defective products containing nicotine and other chemicals known to cause harm to consumers, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's use of the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

278.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or use of JUUL products and nicotine vaping.

279.    Defendants' negligence included:

A.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its JUUL products without thorough and adequate pre- and post-market testing;

B.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not JUUL products were safe for their intended use;

C.    Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of JUUL products so as to avoid the risk of serious harm associated with the prevalent use of JUUL products and nicotine;

D.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use its JUUL products;

E.    Failing to disclose to Plaintiff, users, consumers, and the general public that the use of JUUL products presented severe health risks including nicotine addiction;

F.    Representing that its JUUL products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

G.      Declining to make or propose any changes to JUUL products' labeling or other promotional materials that would alert the consumers and the general public of the true risks of JUUL products;

H.      Advertising, marketing, and recommending the use of JUUL products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of JUUL products;

I.      Continuing to disseminate information to its consumers, which indicates or implies that Defendants' products are not unsafe for their intended use; and

J.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

280. Defendants knew and/or should have known that it was foreseeable that Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of JUUL products.

281. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of JUUL products or JUUL's patented JUULpods liquids by Plaintiff's students.

282. Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

283. Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of its products with full knowledge of the dangers of its products. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendants' reckless conduct, therefore, warrants an award of aggravated or punitive damages.

284. As a proximate result of Defendants' wrongful acts and omissions in placing its defective JUUL products into the stream of commerce without adequate warnings of their hazardous nature, Plaintiff has been injured and suffered economic damages and will continue to incur expenses in the future.

**COUNT IV – GROSS NEGLIGENCE**

285.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

286.    Defendants owed a duty of care to Plaintiff to conduct their business of manufacturing, promoting, marketing, and/or distributing JUUL nicotine products in compliance with applicable state law and in an appropriate manner.

287.    Specifically, Defendants had a duty and owed a duty to Plaintiff to exercise a degree of reasonable care including, but not limited to: ensuring that JUUL marketing does not target minors; ensuring that JUUL e-cigarettes and JUULpods are not sold and/or distributed to minors and are not designed in a manner that makes them unduly attractive to minors; designing a product that is not defective and unreasonably dangerous; designing a product that will not addict youth or other users to nicotine; adequately warning of any reasonably foreseeable adverse events with respect to using the product. Defendants designed, produced, manufactured, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and/or otherwise placed JUUL products into the stream of commerce, and therefore owed a duty of reasonable care to those, including Plaintiff, who would be impacted by its use.

288.    JUUL's products were the types of products that could endanger others if negligently made, promoted, or distributed. Defendants knew the risks that young people would be attracted to their e-cigarettes and JUULpods and knew or should have known the importance of ensuring that the products were not sold and/or distributed to anyone under age 26, but especially to minors.

289.    Defendants knew or should have known that their marketing, distribution, and sales practices did not adequately safeguard minors from the sale and/or distribution of e- cigarette

devices and JUULpods and, in fact, induced minors to purchase JUULproducts.

290.    Defendants were negligent in designing, manufacturing, supplying, distributing, inspecting, testing (or not testing), marketing, promoting, advertising, packaging, and/or labeling JUUL's products.

291.    As a powerfully addictive and dangerous nicotine-delivery device, Defendants knew or should have known that JUUL's products needed to be researched, tested, designed, advertised, marketed, promoted, produced, packaged, labeled, manufactured, inspected, sold, supplied and distributed properly, without defects and with due care to avoid needlessly causing harm. Defendants knew or should have known that their products could cause serious risk of harm, particularly to young persons like students in Plaintiff's schools.

292.    Defendants were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

293.    The negligence and extreme carelessness of Defendants includes, but is not limited to, the following:

A.    Failure to perform adequate testing of the JUUL products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, and other related medical conditions;

B.    Failure to take reasonable care in the design of JUUL's products;

C.    Failure to use reasonable care in the production of JUUL's products;

D.    Failure to use reasonable care in the manufacture of JUUL's products;

E.    Failure to use reasonable care in the assembly of JUUL's products;

F.    Failure to use reasonable care in supplying JUUL's products;

G.    Failure to use reasonable care in distributing JUUL's products;

H.    Failure to use reasonable care in advertising, promoting, and marketing

JUUL's products;

I.     Promotion of JUUL's products to young people under age 26, and especially to minors;

J.     Use of flavors and design to appeal to young people under age 26, and especially to minors, in that the products smell good, look cool and are easy to conceal from parents and teachers;

K.     Use of design that maximizes nicotine delivery while minimizing "throat hit," Thereby easily creating and sustaining addiction;

L.     Failure to prevent JUUL's products from being sold to young people under age 26, particularly to minors;

M.     Failure to prevent use of JUUL's products among young people under age 26, particularly for minors;

N.     Failure to curb use of JUUL's products among young people under age 26, particularly for minors;

O.     Failure to develop tools or support to help people addicted to JUUL's products cease using the products, including manufacturing lesser amounts of nicotine;

P.     Failure to reasonably and properly test and properly analyze the testing of JUUL's products under reasonably foreseeable circumstances;

Q.     Failure to warn its customers about the dangers associated with use of JUUL's products, in that it was unsafe for anyone under age 26, significantly increases blood pressure, carries risks of stroke, heart attacks, and cardiovascular events, is powerfully addictive, can cause permanent brain changes, mood disorders, and impairment of thinking and cognition;

R.     Failure to instruct customers not to use the product if they were under 26, particularly minors, and failing to provide any instructions regarding a safe amount of JUULpods to consume in a day;

S.     Failure to ensure that JUUL's products would not be used by persons like Plaintiff's students who were not smokers and who were under age 26, particularly minors;

T.     Failure to warn customers that JUUL had not adequately tested or researched JUUL products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, and other related medical conditions;

U.  Failure to utilize proper materials and components in the design of JUUL's products to ensure they would not deliver unsafe doses of nicotine;

V.  Failure to use due care under the circumstances;

W.  Failure to take necessary steps to modify JUUL's products to avoid delivering high doses of nicotine to young people and repeatedly exposing them to toxic chemicals;

X.  Failure to recall JUUL's products; and

Y.  Failure to inspect JUUL's products for them to operate properly and avoid delivering unsafe levels of nicotine to young persons.

294.  Defendants breached the duties they owed to Plaintiff and in doing so, was wholly unreasonable. A responsible company, whose primary purpose is to help adult smokers, would not design a product to appeal to minors and nonsmokers nor market their products to minors and nonsmokers. If they are aware of the dangers of smoking and nicotine ingestion enough to create a device to help people stop smoking, then they are aware of the dangers enough to know that it would be harmful for young people and nonsmokers to use.

295.  Defendants breached their duties through its false and misleading statements and omissions in the course of its manufacture, distribution, sale, and/or marketing of JUUL nicotine products within the State.

296.  As a foreseeable consequence of Defendants' breaches of their duties, Plaintiff suffered direct and consequential economic injuries as a result of dealing with the JUUL epidemic in Plaintiff's schools.

297.  Defendants' breaches of their duties involved an indifference to duty amounting to recklessness and actions outside the bounds of reason, so as to constitute gross negligence.

298.  Defendants' gross negligence was egregious, directed at the public generally, and involved a high degree of moral culpability.

**COUNT V – PUNITIVE DAMAGES**

299.    Plaintiff incorporates by reference all preceding paragraphs.

300.    Defendant was grossly negligent in that Defendant committed intentional acts of an unreasonable character in disregard of known or obvious risks so great as to make it highly probable that harm would result in the court of their manufacture, distribution, sale, promotion, advertising and/or marketing JUUL products within the State.

301.    Defendant knew the risks that minors would be attracted to their e-cigarettes and JUULpods and knew or should have known the importance of ensuring that the products were not sold and/or distributed to minors and young people.

302.    Defendant could have easily marketed the products to a whole different audience of prior smokers as well as could have easily informed the ultimate consumers of the extremely high nicotine content, the true level of which Defendant fraudulently misrepresented and concealed.

303.    Defendant intentionally and willfully breached the duties they owed to Plaintiff and in doing so, were wholly unreasonable. Defendant breached their heightened duties owed to minors when they oppressively and intentionally marketed and sold JUUL products to minors, which they should not have done.

304.    Defendant's acts and omissions constitute gross negligence and wanton and willful conduct, because they constitute a total lack of care and an extreme departure from what a reasonably careful person or a reasonably careful company that holds itself out as manufacturers of smoking cessation devices would do in the same situation to prevent foreseeable harm to younger persons.

305.    Defendant intentionally misrepresented, deceived, and/or concealed material facts

known to Defendant regarding the nature of the JUUL and the risks associated therewith. Defendant took these actions with the intention of causing minors to use and become addicted to JUUL, including use of the JUUL device on school grounds.

306.     Defendant specifically acted as detailed in this Complaint with the specific intention to cause minors to use and become addicted to JUUL and/or carried out these actions with a flagrant indifference to the right of Plaintiff and with a subjective awareness that their conduct would result in bodily harm, including, but not limited to, addiction.

307.     Defendant acted and/or failed to act willfully and with conscious and reckless disregard for the life, health, safety, rights and interests of Plaintiff. Defendant's acts and omissions had a great probability of causing significant harm and in fact resulted in such harm.

308.     But for Defendant's duties and breaches thereof, Plaintiff would not have been harmed as alleged in this Complaint.

309.     As a consequence of each such intentional act, Plaintiff suffered direct and consequential economic injuries.

310.     Defendant's willful misconduct was egregious, directed at the public generally, and involved a high degree of moral culpability.

## COUNT VI – STRICT PRODUCT LIABILITY
   ## — FAILURE TO WARN

311.      Plaintiff incorporates by reference all preceding paragraphs.

312.     Defendant designed, manufactured, marketed, distributed, and sold JUUL e-cigarettes and JUULpods, or has partnered to design, manufacture, market, distribute, and sell JUUL e-cigarettes and JUULpods.

313.     At all times relevant, Defendant was well-aware of the dangers of vaping and nicotine use, including use of JUUL's products, as described herein.

314.    At all times relevant, Plaintiff and students at Plaintiff's school were not aware of and would not have recognized the risks of using a JUUL e-cigarette with a JUULpod because Defendant intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks to users' mental and physical health from use of Defendant's products, including high-levels of nicotine exposure and nicotine addiction.

315.    In all forms of advertising, including but not limited to social media communications, Defendant failed to warn adequately or instruct foreseeable users, including youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harm caused by vaping JUULpods, including but not limited to nicotine exposure and addiction. Defendant failed to warn adequately in their advertising or anywhere on the product that the product was not safe for minors and, instead, posed serious immediate and long-term health risks, and should not be used or consumed by them. Rather, Defendant intentionally marketed their products to minors in youth-friendly colors and flavors. Defendant also designed their products to be more palatable to youth and nonsmokers by making JUUL e-cigarettes easier to inhale while increasing the level of nicotine that is absorbed by users, making them even more addictive.

316.    The defects in JUUL's products, including the lack of warnings or instructions, existed at the time the JUUL e-cigarettes and JUULpods were sold and/or when the JUUL e-cigarettes and JUULpods left JUUL's possession or control.

317.    JUUL's e-cigarettes and JUULpods were anticipated to be used by youth, including students, without substantial change in their condition from the time of their manufacture or sale.

318.    Plaintiff was harmed directly and proximately by Defendant's failure to warn. Such harm includes significant and ongoing nicotine abuse and addiction by students at Plaintiff's

schools, which has necessitated and continues to necessitate significant steps to combat and mitigate use of Defendant's products by students. Use of Defendant's products by students at Plaintiff's schools frustrates Plaintiff's ability to achieve its educational goals and ensure the safety of Plaintiff's students which, again, has required and continues to require significant expenditures of Plaintiff's resources to address these conditions.

## COUNT VII – STRICT PRODUCT LIABILITY —DESIGN DEFECT

319.     Plaintiff incorporates by reference all preceding paragraphs.

320.     Defendant designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the JUUL e-cigarettes and JUULpods, which were intended by Defendant to be used as a method of vaping nicotine and the other aerosolized constituents of JUUL's nicotine solution.

321.     Defendant knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious, particularly to youths and adolescents, including students at Plaintiff's schools.

322.     As described herein, Defendant designed and marketed their products to appeal to nonsmokers, youths and adolescents and to encourage them to buy and use the product. Because JUUL products deliver significantly more nicotine into a user's bloodstream than combustible cigarettes and contain more nicotine than JUUL represents, thereby posing an unnecessary risk of addiction and other severe health consequences, they are inherently defective. In addition, because JUUL products are made to create and sustain addiction, including through a quicker and more potent delivery system than Defendant represented and compared to any other nicotine vaping product, they are unreasonably dangerous and defective in design. The risks inherent in the design

of JUUL products outweigh significantly any benefits of such design, including any benefit as an alternative to smoking combustible cigarettes.

323.    At all relevant times, Defendant could have employed reasonably feasible alternative designs to prevent the harms discussed herein.

324.    At all relevant times, Plaintiff and Plaintiff's students were unaware of the design defects described herein. Further, Defendant knew or had reason to know that youths and adolescents, including students who Defendant told their products were "totally safe," would not fully realize the dangerous and addictive nature of JUUL products and the long-term complications nicotine addiction can present, or that, due to their youth, inexperience and/or immaturity of judgment, would recklessly disregard such risks.

325.    Plaintiff was harmed directly and proximately by Defendant's defectively designed JUUL e-cigarette and JUULpods. Such harm includes significant and ongoing nicotine abuse and addiction by students at Plaintiff's schools, which has necessitated and continues to necessitate significant steps to combat and prevent use of Defendant's products by students. Use of Defendant's products by students at Plaintiff's schools frustrates Plaintiff's ability to achieve its educational goals and ensure the safety of Plaintiff's students which, again, has required and continues to require significant expenditures of Plaintiff's resources to address these conditions.

**COUNT VIII – UNJUST ENRICHMENT**

326.    Plaintiff incorporates by reference all preceding paragraphs.

327.    As a result of Defendant's unlawful and deceptive actions described above, Defendant was enriched at the expense of Plaintiff.

328.    Defendant JUUL retained the benefits under such circumstances as make the retention inequitable. Defendant's unlawful and deceptive acts were undertaken to gain market

share and revenue through increased usage of JUUL's products by students.

329.     It is against equity and good conscience to permit Defendant to retain the benefits they received as a result of their wrongful and continuing acts, practices and omissions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.     Awarding Plaintiff compensatory damages, trebled, in an amount to be determined at trial;

2.     Awarding Plaintiff punitive damages;

3.     Ordering all appropriate equitable remedies, including but not limited to declaratory and injunctive relief;

4.     Awarding Plaintiff attorneys' fees and costs;

5.     Awarding prejudgment interest as permitted by law;

6.     Affording Plaintiff with such further and other relief as deemed just and proper

7.     Entering an Order that the Defendants are jointly and severally liable;

8.     Entering an Order requiring the Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance;

9.     Enjoining Defendants from engaging in further actions causing or contributing to the public nuisance as described herein;

10.     Awarding equitable relief to fund prevention education and addiction treatment; and

11.     Awarding statutory damages in the maximum amount permitted by law.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

RESPECTFULLY SUBMITTED,

By:  /s/Thomas W. King, III
Thomas W. King, III, Esquire
PA ID. 21580;  tking@dmkcg.com
Thomas E. Breth, Esquire
PA ID. 66350; tbreth@dmkcg.com
Jordan P. Shuber, Esquire
PA ID. 317823; jshuber@dmkcg.com
Michael D. Shakley, Esquire
PA ID. 329461; mshakley@dmkcg.com
Dillon McCandless King Coulter & Graham, LLP
128 West Cunningham Street
Butler, PA 16001
(724) 283-2200 telephone; (724) 283-2298 fax